**THE ROSEN LAW FIRM, P.A.**
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Brian B. Alexander, Esq. (BA 6057)
Jing Chen, Esq. (JC 2908)
275 Madison Ave., 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
        lrosen@rosenlegal.com
        balexander@rosenlegal.com
        jchen@rosenlegal.com

*Counsel for Plaintiff*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID HOROWITZ, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SUNLANDS TECHNOLOGY GROUP, TONGBO LIU, YIPENG LI, JIANHONG YIN A/K/A PENG OU, LU LU, MICHAEL MINHONG YU, YANG WANG, GAONENG JI, SAM HANHUI SUN, XIAOCHUAN WANG, GOLDMAN SACHS (ASIA) L.L.C., CREDIT SUISSE SECURITIES (USA) LLC, AND J.P. MORGAN SECURITIES LLC,<br><br>    Defendants. | **Case No: 1:19-cv-03744-FB-SMG**<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED**<br><br><u>**CLASS ACTION**</u> |

Plaintiff David Horowitz ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other

matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Sunlands Technology Group ("Sunlands" or the "Company")[1], media and analyst reports about the Company and Company press releases, review of articles and information available in the People's Republic of China ("PRC" or "China"), and interview of witnesses. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein.

## NATURE OF THE ACTION

1.      Plaintiff brings this securities class action on behalf of persons who purchased or otherwise acquired Sunlands securities pursuant or traceable to the registration statement and related prospectus (collectively, the "Registration Statement") issued in connection with Sunlands' March 2018 initial public stock offering (the "IPO" or "Offering"), seeking to recover compensable damages caused by Defendants' violations of the Securities Act of 1933 (the "Securities Act").  The SEC declared the Registration Statement effective on March 22, 2018 and Sunlands filed its final Prospectus for the IPO on Form 424B4 on March 23, 2018 (the "Prospectus").

2.      In the IPO, Sunlands issued approximately 13 million American Depository Shares ("ADS") to the investing public at $11.50 per ADS, pursuant to the Registration Statement.

3.      Sunlands is headquartered in China and provides online education services there. The vast majority of Sunlands' business is the sale of preparation courses for Self-Taught Higher Education Examinations in China.

4.      Sunlands' Registration Statement portrayed an education company rapidly expanding due to the quality of its courses and faculty and its positive engagement with students.

---

[1]      The definition of Sunlands includes all of its subsidiaries and affiliates.

5.      The reality behind Sunlands' growth was much different, however.  At the time of the IPO and contrary to the Registration Statement, the Company's success was predicated on Sunlands sales personnel's aggressive use of illegal misrepresentations to trick students into purchasing courses.

6.      In mid-March 2018, right before Sunlands' IPO, an undercover reporter from the Beijing News, a news outlet owned by the Chinese government, applied to be a "Learning Planner" at Sunlands.  He quickly learned that the position was no different from being a sketchy telemarketer.

7.      With a large number of other trainees, he was shown techniques by Sunlands trainers to trick students into buying courses using misrepresentations.   These techniques included:

- Using various fake teacher identities to gain the trust of students even though none of the salespeople were actually teachers.

- Making up false registration deadlines for courses.

- Falsely claiming that the examinations students had to pass would be more difficult if the students registered later.

- Falsely claiming the price of the course was discounted for only one day.

- Falsely telling students who wanted to study subjects for which Sunlands did not offer a course that Sunlands did offer the course, but that it was too difficult for that student.  The salesperson would then steer the student to Sunlands courses in different areas by portraying those exams as easy.

8.      Several confidential witnesses interviewed by Plaintiff's investigator who worked for Sunlands in Guangzhou and Beijing confirmed that use of the misrepresentations described

above and others to sell courses was the standard practice at Sunlands.  The confidential witnesses highlighted major deceptions about "installment payments" and refunds:

- Sunlands salespeople convinced students to pay for courses with installment payments that were made possible by Sunlands taking out a loan from a third-party provider in the student's name.  It was not disclosed to students that they were taking out loans, loans could not be cancelled, and they were part of the student's personal credit history.

- Sunlands salespeople lied to students about the availability of course refunds and even if a student was owed a refund, Sunlands would delay issuing it, hoping that the student would get discouraged and give up on his or her request.

9.      Beijing News published its investigation on May 2, 2018, less than two months after Sunlands' IPO.

10.     Spurred by the revelations from Beijing News, the Beijing Administration for Industry and Commerce Shijingshan Branch — Sunlands' regulator — issued an administrative penalty decision on July 4, 2018, fining Sunlands because it made false and misleading statements that violated China's anti-unfair competition law.

11.     Sunlands' Registration Statement was replete with statements describing Sunlands' marketing techniques, installment payment system, refund rules, and extolling its rapid growth in new students and gross billings,[2] but omitted any mention of the improper sales techniques and misstatements to students that are detailed below.

---

[2]      Sunlands' Registration Statement describes Gross Billings, a non-GAAP measure, as the total amount of cash received for the sale of course packages, net of the total amount of refunds paid in such period.

12.     Those omissions were clearly material.  Sunlands' new student sign ups and gross billings dropped dramatically after Sunlands admitted it was forced to use "softer marketing tactics."   Additionally, on May 29, 2019, Credit Suisse issued an analyst report stating that Sunlands had suffered significant brand damage and it saw the July 4, 2018 administrative penalty decision as a major source of the slowdown.

13.     By the commencement of this action, Sunlands ADSs traded around $2.28 per ADS, an over 80% decline from its IPO price.

## JURISDICTION AND VENUE

14.     The claims alleged herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§77k and 77o.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 22 of the Securities Act (15 U.S.C. §77v).

16.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and §22(a) of the Securities Act (15 U.S.C. §77v(a)) as a significant portion of the Defendants' actions, and the subsequent damages took place within this District.

17.     In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.  Defendants disseminated the statements alleged to be false and misleading herein into this District, and Defendants solicited purchasers of Sunlands securities in this District.

**PARTIES**

18.     Lead Plaintiff, as set forth in his previously filed certification incorporated by reference herein, purchased Sunlands ADSs pursuant and/or traceable to the IPO and was damaged thereby.

19.     Defendant Sunlands is an online post-secondary and professional education company in China.  Sunlands is a Cayman Islands corporation with principal executive offices located at Building 4-6, Chaolai Science Park, No. 36, Chuangyuan Road, Chaoyang District, Beijing, 100012, PRC. Sunlands ADSs are listed on the New York Stock Exchange ("NYSE") under the ticker symbol "STG." Sunlands was formally known as Sunlands Online Education Group until August 2018.

20.     Defendant Tongbo Liu ("Liu") was, at all relevant times, Sunland's Chief Executive Officer and a Director. Defendant Liu reviewed, contributed to, and signed the Registration Statement.

21.     Defendant Yipeng Li ("Li") was, at all relevant times, Sunland's Chief Financial Officer.  Defendant Li reviewed, contributed to, and signed the Registration Statement.

22.     Defendant Jianhong Yin ("Yin"), also known as Peng Ou, is the founder of Sunlands and was Chairman of Sunlands' of the Board of Directors at all relevant times. Defendant Yin reviewed, contributed to, and signed the Registration Statement.  He also separately signed the Letter from Our Founder and Chairman in the Registration Statement.

23.     Defendant Lu Lu ("Lu") was, at all relevant times, a Director of Sunlands. Defendant Lu reviewed, contributed to, and signed the Registration Statement.

24.     Defendant Michael Minhong Yu ("Yu") was, at all relevant times, a Director of Sunlands. Defendant Yu reviewed, contributed to, and signed the Registration Statement.

25.    Defendant Yang Wang was, at all relevant times, a Director of Sunlands. Defendant Yang Wang reviewed, contributed to, and signed the Registration Statement.

26.    Defendant Gaoneng Ji ("Ji") was, at all relevant times, a Director of Sunlands. The Registration Statement states Defendant Ji had accepted appointment as a Director of Sunlands effective upon the SEC's declaration of effectiveness of the Registration Statement.

27.    Defendant Sam Hanhui Sun ("Sun") was, at all relevant times, a Director of Sunlands.  The Registration Statement states Defendant Sun had accepted appointment as a Director of Sunlands effective upon the SEC's declaration of effectiveness of the Registration Statement.

28.    Defendant Xiaochuan Wang was, at all relevant times, a Director of Sunlands. The Registration Statement states Defendant Ji Xiaochuan Wang accepted appointment as a Director of Sunlands effective upon the SEC's declaration of effectiveness of the Registration Statement.

29.    The Defendants named in ¶¶20-28 are referred to herein as the "Individual Defendants."

30.    Defendant Goldman Sachs (Asia) L.L.C. is a financial services company that acted as an underwriter for Sunlands' IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Sunlands securities issued pursuant thereto.

31.    Defendant Credit Suisse Securities (USA) LLC is a financial services company that acted as an underwriter for Sunlands' IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Sunlands securities issued pursuant thereto.

32.     Defendant J.P. Morgan Securities LLC is a financial services company that acted as an underwriter for Sunlands's IPO, helping to draft and disseminate the Registration Statement and solicit investors to purchase Sunlands securities issued pursuant thereto.

33.     The Defendants named above in ¶¶30-32 are referred to herein as the "Underwriter Defendants." Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize in, among other things, underwriting public offerings of securities. They served as the underwriters of the IPO and shared tens of millions of dollars in fees collectively. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Sunlands, met with potential investors and presented highly favorable information about the Company, its operations and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Sunlands and the Individual Defendants that Sunlands would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that Sunlands had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Sunlands and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Sunlands, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to internal, confidential, current corporate information concerning Sunlands's most up-to-date operational and financial results and

prospects.

(d)     In addition to availing themselves of virtually unlimited access to internal corporate documents, agents of the Underwriter Defendants met with Sunlands's lawyers, management and top executives and engaged in "drafting sessions" between at least December 2017 and March 2018. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Sunlands ADSs would be sold; (iii) the language to be used in the Registration Statement; what disclosures about Sunlands would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and Sunlands' management and top executives, the Underwriter Defendants knew of, or in the exercise of reasonable care should have known of, Sunlands' existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the offers and sales of securities registered thereby, including those to Plaintiff and the other members of the Class.

34.     Sunlands, the Individual Defendants, and the Underwriter Defendants are referred to collectively as "Defendants."

## SUBSTANTIVE ALLEGATIONS

35.     On February 23, 2018, Sunlands filed with the SEC a registration statement on Form F-1, which, incorporating and in combination with subsequent amendments on Forms F-1/A and filed pursuant to Rule 424(b)(4), would be used for the IPO.

36.     On March 20, 2018, Sunlands filed its final amendment to the Registration Statement, which registered over 13 million Sunlands ADSs for public sale, or 520,000 Class A

Ordinary Shares as each ADS represented one Class A ordinary share. The SEC declared the Registration Statement effective on March 22, 2018.  On March 23, 2018, Defendants priced the IPO at $11.50 per ADS and filed the final Prospectus for the IPO on Form 424B4, which forms part of the Registration Statement. Through the IPO, Defendants issued and sold approximately 13 million ADSs, pursuant to the Registration Statement, raising approximately $150 million.

37.     Sunlands provides online post-secondary and professional education services in China.  According to the Registration Statement, as of December 31, 2017, the Company offered Self-taught Higher Education Examinations, or ("STE"), programs covering 18 majors. STEs are an education system that was initiated by the Chinese government in the early 1980s as an alternative to the formal higher education that students admitted into universities and colleges receive. The system was created for the purpose of giving people who previously missed the opportunity for higher learning a chance to further their studies outside the normal university education system.   The STE system contains two components: (1) the self-taught program, consisting of courses within a specific study area provided by education-service institutions, such as Sunlands, and (2) national examinations administered by the Chinese government that the students must pass to receive credit for the courses.  In 2017, STE courses accounted for 89.2% of Sunlands' gross billings and 80.1% of its new student sign-ups.

**A. Leading up to and at the time of the IPO, Sunlands Relied on Improper Sales and Marketing; Beijing News Exposed Improper Conduct at Sunlands; and Sunlands is Fined by its Regulator.**

38.     Sunlands' Registration Statement portrayed a company rapidly expanding on the strength of the Company's "ability to cultivate an engaging community among students, teachers and mentors, strong educational content development capabilities, and high-quality faculty, which combined allow us to continually improve the student learning experience."

39.     The  actual  reality  behind  Sunlands'  growth  was  much  different.    Instead,  as

explained in an article in the Chinese publication Shijie: "Sunlands has been surrounded by the controversy since its listing: Sunlands not only focuses on marketing, **but also forced marketing**."[3] (emphasis added).

40.    On May 2, 2018, less than two months after Sunlands' IPO, the Beijing News published an article entitled *The Three Enrollment Methods of Sunlands Technology Group* on its Chinese language website BJnews.com.cn.  The article described how one of its reporters applied for the position of "Learning Planner" at the Beijing headquarters of Sunlands *in mid-March, right before Sunlands' IPO.*

41.    The undercover reporter learned that the application for a Learning Planner required only a high school education and that experience in telephone sales was preferred.  The job was "actually [to be] a telemarketer."  The Sunlands interviewer told the reporter that the Company's sales personnel would impersonate teachers, including "academic advancement teachers, education planning teachers, student status consulting teacher of self-study examination and assistant teachers to deal with students in different situations," even though the sales personnel were not teachers.

42.    The reporter was also instructed that new staff in sales positions at Sunlands needed five days of training before starting work and they would be dismissed if they did not make any sales within 18 days.

43.    As a Sunlands trainee, the reporter was "exposed to such enrollment methods as false propaganda" and "difficulty in refund." He also learned how to assume "multiple identities," "make false promises," and use "verbal tricks."

44.    The reporter attended a training session for new Sunlands sales staff on March 14,

---

[3]    Joice Wang, *What a Mess behind Flood the Screen by Sunlands: Fraud, False Advertising and Difficulty in Refund*, Shijie, July 19, 2019.

2018 (the IPO was March 22, 2018).  As the Sunlands interviewer did, the Sunlands trainer told the class that they should pose as a teacher at an adult education counseling center, even though it was illegal under Chinese law to impersonate a teacher.

45.     One of the dishonest sales tactics set forth in the Sunlands' training materials was "a detailed description of the transformation of identity, so that the salespersons can communicate with the students by using different identities such as 'class director', 'teaching director', 'principal', 'manager', [and] 'teacher who organizes the student status.'"  Each fake identity had a corresponding script to persuade wavering students, often with misleading assertions.

46.     Sunlands' training materials also indicated that WeChat[4] should be used to communicate with students who could not be reached on the phone and advised that the salesperson pose as a woman when taking to a man and a man when talking to a woman.

47.     The reporter learned in the training that Sunlands only offers courses in a fraction of the subjects for which there are STE exams.  The salespeople were not supposed to admit this to students, however.  The Sunlands trainer explained: "If students ask us the subjects we don't have, you can't say no, or they will leave."  Instead of admitting Sunlands did not have the course, the salespeople were instructed to say that the course of study the student wanted to take was too difficult and to portray every major that Sunlands offered "as a simple and easy-to-test major" that was valuable for employment — these techniques were effective as salespeople were instructed to impersonate teachers and other authority figures in education.

48.     The training materials contained several other dishonest tricks to pressure students to buy courses under false pretenses, including:

- Falsely claiming the price of the course was discounted for only one day.

---

[4]     WeChat is a Chinese multi-purpose messaging, social media, and mobile payment application for smart phones.

- Making up false registration deadlines for courses.

- Falsely claiming that examinations the students had to pass would be more difficult if they registered later.

49. The Beijing News article also described lies that a Sunlands salesperson told Zhao Yu, an STE student. Yu was unable to sign up for certain STE examinations because he lacked the proper academic status. He told Beijing News that "[o]n March 10 [2018], Sunlands told me that it was the last day to make the additional recording, otherwise it would have to wait until October to register for examination" and that if he signed up he would also be exempt from taking English exams. Based on the information that the Sunlands salesperson gave Yu, he paid for a Sunlands course. He found out later that none of Sunlands' promises were true.

50. The State Administration for Industry & Commerce ("SAIC") is a powerful ministry in China that has great influence over the Chinese economy and markets. The SAIC is "the competent authority of ministerial level directly under the State Council in charge *of market supervision/regulation and related law enforcement* through administrative means."[5] Its functions are to maintain market order and protect the legitimate rights and interests of businesses and consumers. The SAIC is charged with promulgating and enforcing laws and regulations affecting all manner of business activities, including business registration, consumer protection, product quality, illegal marketing, unfair trade practices, trademarks, brokerage activity, contracts, mortgages, anti-monopoly, credit rating, advertising, and most pertinently, online or e-commerce activities. In 2018, the SAIC and its local offices were merged into the newly formed State Administration for Market Regulation during a March 2018 government restructuring initiative.

---

[5]https://web.archive.org/web/20080925145823/http://www.saic.gov.cn/english/About%20Us/t200 60225_14598.htm (emphasis added).

51.     The SAIC has local offices on each provincial, municipal or district/town level that are referred to as AICs.  They oversee and regulate the businesses in their jurisdiction.  Sunlands is located within the direct jurisdiction of the Shijingshan Branch of Beijing AIC.

52.     On July 4, 2018, less than four months after Sunlands' IPO, the Beijing AIC — Shijingshan Branch issued an administrative penalty decision fining Sunlands because of false and misleading statements that were first revealed in the Beijing News ("July 4, 2018 Penalty Decision"):

> Based on investigations: In the process of providing a self-study examination consultation service, the Party claimed, "If you miss the self-taught examination registration in the first half of 2018, you can be additionally matriculated as a current student; if you sign up early, you do not need to take examinations for mathematics and English; if you sign up late, there are more difficult and more examination subjects than now" among other false and misleading statements. These actions were publicly revealed by reporters of *The Beijing News* via newspapers and the internet.

53.     The July 4, 2018 Penalty Decision further stated that Sunlands' actions violated China's anti-unfair competition law and ordered Sunlands to cease illegal activity:

> The aforementioned actions of the Party violated Paragraph 1, Article 8 of *Anti-Unfair Competition Law of People's Republic of China*, constituting an operator's false and misleading commercial publicity regarding merchandise to trick and mislead consumers.
> Pursuant to Paragraph 1, Article 20 of Anti-Unfair Competition Law of People's Republic of China, the Party is ordered to cease illegal activity, and the following administrative penalty is imposed as follows: A fine of RMB 900000.

54.     Article 8 of China's Anti-Unfair Competition Law prohibits a business operator from making false or misleading publicity of product performance, function, quality, sales, user comments and prizes

55.     The Beijing AIC — Shijingshan Branch first served an *Administrative Hearing Notice* to inform Sunlands of the content of the July 4, 2018 Penalty Decision on June 14, 2018, less than three months after Sunlands completed its IPO.

56.     On May 16, 2019, the Beijing AIC — Shijingshan Branch issued another administrative penalty decision against Sunlands.  The decision stated that Sunlands had violated "Paragraph 1 and Subparagraph (2) of Paragraph 2 in Article 28 of *Advertising Law of the People's Republic of China*, as false advertising in which advertised service content was inconsistent with facts" based on the following:

> Between November 2, 2018 and December 2, 2018, on the UC browser (UC Toutiao) on mobile phones, the Party published an advertisement containing the content "Stop buying counterfeit academic credentials! There's an undergraduate program in Beijing that can be finished in one year and is recognized by the state!" After investigation, it was verified that after students complete the specialty courses in one year, they do not obtain undergraduate degrees; the Party does not have the power to confer academic certificates. In order to obtain an undergraduate degree, a student would still have to participate in the unified examination offered by the state. Therefore, the advertisement content published by the Party was inconsistent with actual facts.

57.     Under Article 28 of China's Advertising Law, any advertisement that defrauds or misleads consumers with any false or misleading content is an illegal false advertisement.

**B. Former Sunlands Employees Interviewed by Plaintiff's Counsel's Investigator Confirm that the Improper Sales Techniques Were Pervasive at the Company Before and at the time of its IPO and That the Company Trained Them to Use Such Techniques.**

1)      Sunlands' High Pressure, Dishonest Sales Tactics

58.     Confidential Witness 1 ("CW1")[6] was a Study Planner for Sunlands in Guangzhou from July 2017 until May 2018.  His job duties were to recommend courses and make sales to clients online through WeChat or phone calls.

59.     CW1 stated that the salespeople at Sunlands had "pressure" and to meet their sales targets, Sunlands held training sessions at which the Salespeople were taught tricks to persuade students to sign up.  These tricks included making false promises concerning national

---

[6]     All references to confidential witnesses refer to witnesses contacted by Plaintiff's investigator.  All confidential witnesses are referred to as "he" regardless of gender to preserve anonymity.

scholarships and student status and persuading students to switch their majors even when it was not in the student's best interest.

60.     CW1 described the national scholarship scam perpetrated by Sunlands salespeople as follows: the salesperson would raise the price of the course and claim there was a limited time offer of national scholarship subsidies.  CW1 admitted that "*[w]e boasted like that but in fact national scholarship and such stuff are all made-up. Nothing as such existed*." (emphasis added).

61.     Another scam that CW1 described was that they would promise to add Student Status, which is status as a higher education student in China,[7] even though the Company had no ability to do that:

> *Promising to add student status, this is all false*. *The salespeople make claims that Sunlands can do this, but it's all lies.*  Sunlands did not have connection with the Education Bureau. Only the Education Bureau has authority to add student status. Sunlands does not have the authority but the sales made fake promises facing the students. When the student found out about the trap, they already paid the course fees. *I believe this to be deception in sales and it is wrong.*

(emphasis added).

---

[7]     As explained on the China Higher Education Student Information (CHSI) website which is maintained by China Higher Education Student Information and Career Center (CHESICC), an institution directly under Chinese Ministry of Education, "student status" is the recognition of the qualification of a higher-education student to study at school.  One needs to obtain a student status first in order to obtain the student identity and the qualifications to study. According to the General Higher Education School Student Management Rules issued by the No. 21 Minister of Education Order, new students admitted pursuant to the national enrollment requirements should conduct the enrollment procedures at school during the required time and with the admission notification. The school will review the student within three months pursuant to the national enrollment requirements. If the student passes the review, the student will be registered and given student status. Pursuant to the Rules, only a student who has sat for the college admission test and gone through the enrollment procedure of a provincial admission committee has the possibility of obtaining student status from the school that admits him or her. Accordingly, someone cannot obtain student status in the STE system and Sunlands has no power to add it for its students. *See* https://www.chsi.com.cn/help/xjcx.jsp.

62.     CW1 explained that they were also coached by Sunlands to steer students to exams that Sunlands offered even if students were actually interested in a different course of study.  He explained that "[m]any salespersons at Sunlands are very good at inciting people and students incited by them will easily pay course fees out of impulse. After one day, many would regret having made the purchase."

63.     CW1 further stated that many Sunlands salespeople, who were posing as educators, lied about how easy it was to pass STE exams, causing many unqualified students to sign up and later regret their purchases:

> Sunlands' courses are for private exams which are not easy to pass. Many students don't know about this, because sales people will tell them the exams are easy, some might even say the pass rate is so high that basically if you register you are very likely to pass, they (salespeople) speak of things as if they are very easy. *These are all false. Private exams are not very easy* and one cannot ask those proxy people to take the exams on behalf of you. For instance, English exams, if the salespeople tell the students the exams are about the same difficulty of College English Test Band 4, will they want to register for the courses? *Many of Sunlands's students are of low education background which means band 4 is quite difficult for them. They will not want to register if they know this.* Therefore, the salespeople will speak of the exams as easy ones.
>
> *After the students register and finish one of the courses, they will know they are deceived*, they will find out that the exams are very difficult ones and they will likely fail. Therefore, many will want refund and the give-up rate is high. *Back in my times, if for instance I signed 10 students, approximately 7 of them will regret and will want their money back.* But salespeople are not in charge of refund. Sales only have to focus on signing more students and they have no responsibility in whether the students will want refund or not later on.

(emphasis added).

64.     Finally, CW1 stated that Sunlands salespeople falsely promised potential clients that they would be exempt from certain STE exams if they registered early and/or that the exams would be more difficult if the student registered later:

> *Exemption from exams or exams becoming more difficult if registering late, this is also all lies. This does not exist, all are lies.* Many of Sunlands' typical clients have low education background, or are student's mums who are

housewives that don't know much about things. They don't know much about things and therefore are easily beguiled by the sales' tricks.

(emphasis added).

65.     Confidential Witness 2 ("CW 2"), who worked in sales for Sunlands in Guangzhou from March 2018 to September 2018, gave a similar account as CW1.

66.     CW2 stated that employees at Sunlands used aggressive sales techniques they learned at official company training sessions and that media reports concerning Sunlands' sales deceptions were true:

> Back then employees at Sunlands used very aggressive sales techniques. *I read those media articles, and I can say that most of the information reported by the media is true*. At those sales training sessions, they will tell salespersons some sales pitch tricks, and the salespeople will use these tricks to sell the services. *To be honest, I would rather call it deception. I have also attended these sales sessions*.

(emphasis added).

67.      Like CW1, CW2 stated that Sunlands salespeople routinely lied about whether they could add student status:

> Promising to add student status, indeed back then we did say that. During the training period we learnt to say these things. This was one of the tricks that were used. Sunlands has no authority to add student status. I checked about these and Sunlands did not have this authority, and certainly cannot help the students to add student status. Yes, back then many salespersons will make such promises, it was one kind of sales pitch tricks.

68.     CW2 also confirmed the fact that Sunlands salespeople would falsely claim that early registration conferred advantages to trick people into signing up quickly:

> Raising the price first and then claiming discount, or claims that early registration will get exam exemptions, and exams will get easier if registered early. Yes, indeed so (the sales said these things). This was all part of the sales pitch tricks. In fact, these cannot be fulfilled. Raising the price, it is very commonly seen sales tricks, and exemption of exams or exams being easier, in fact this never happens. Whenever you register, the exams are the same. Some students might have certain diploma in certain fields and might get exemption in related exams, but it is the

exemption as allowed by the official exam regulations. This has nothing to do with the timing that you register.

69.     Two additional confidential witnesses who worked for Sunlands in Beijing further corroborated the accounts of CW1 and CW2—who both worked in Guangzhou.

70.     Confidential Witness 3 ("CW3") was a Sales Manager for Sunlands in Beijing from March 2018 to October 2018.  He was in charge of managing a sales team that described products to potential clients online and recommended courses.

71.     He admitted that multiple dishonest tricks were used by Sunlands salespeople, including fake exam exemptions based on early registration:

> In terms of sales pitch trick, there are indeed several tricks that are used. Things like raising the price first and then say there's a discount, or claiming that there will be exam exemptions or that the exams are easier if registered early, these things were indeed said by the salespeople.

72.     Confidential Witness 4 ("CW4") worked for Sunlands as a Study Consultant in Beijing from February 2018 to September 2018.  He Introduced products to clients and made sales online or through phone calls.   In his interview, he echoed the statements of other CWs that Sunlands Salespeople lied about their ability to add student status:

> Adding student status, well, Sunlands mainly services privately run exams, and there is no such thing as adding student status in private exams. For these exams, you enroll in March, June, or September every year, there are these 3 periods where registration is open, and the student will just have to register in these three periods, and certainly they can successfully register. Sunlands does not have much connection with universities or self-taught higher education examination bureaus. If the student misses the registration open period, then she/he misses it. Sunlands cannot help in this. If the registration is closed in the province where the student is whilst in the neighboring province the registration is still open, then we advise the student to register there. This is what we can do. ***Did salesperson promote that Sunlands can add student status? Well, yes, they did. It is the tricks the salespeople use***.

(emphasis added).

2) Sunlands Employees Sold Students Loans by Offering Them "Installment Payments" Without Disclosing That the Student was Taking Out a Personal Loan for the Full Cost of the Course.

73.     In 2015, Sunlands launched a payment option under which students could obtain loans from third-party credit providers to finance all or part of the student's tuition.  Under the loan agreement between the borrowing student and lending credit provider, the borrowing student is obligated to reply the loan principal in installments over a period ranging from 3 to 12 months. Sunlands is responsible for the interest payments and service fees for the loans, but the student is responsible to the third-party credit provider for the entire principal of the loan without any assistance from Sunlands.  In 2017, 72.9% of Sunlands' gross billings came from third-party credit providers.

74.     Several confidential witnesses stated that when selling "installment payments" to students, they would not disclose that the student was taking out a personal loan.  CW2 admitted that the salespeople did this because many students would not have agreed to purchase courses if they knew they were taking out a loan:

> [S]alespersons will say they are installments, that we can do installment payments. ***Because if you make it clear that it is a loan, then many will not want to use this service***. Well, yes, in many occasions the salespeople just does [sic] it all. Back then many loans were made in this way, the salesperson directly tells the students that they can do instalment payments, and then they trick the students to provide their ID documents, and then the loan can be made.

(emphasis added).

75.     CW1 similarly stated that Sunlands salespeople would sell students installment payments without disclosing that the student was signing up for a personal loan and that it was connect to the student's personal credit record:

> For loans, salespeople will only say it is installment payments, that we can arrange instalment payments. If the salespeople [sic] is a kind person she/he might point it out to the student that they absolutely have to pay back the money on time. But they will not tell the student that this is connected with their personal

- 20 -

credit record. It depends on whether the salesperson is kind enough; if they don't feel guilty, they won't warn the student to make sure they pay back the money on time. But the loan is connected with the student's personal credit record, it is a serious thing. So, it was very bad [for Sunlands to do so].

76.     CW3 told a similar story, emphasizing that the loan could not be cancelled once the student agreed to it:

> [T]he salespeople will not tell the students it is loan, but rather they will say it is installment payments, to better make sure the student will sign the deal. In fact, these are formal loans that are affiliated with personal credit record. If the student defaults on paying this loan, it will affect their personal credit record. If the loan was made then certainly it cannot be cancelled, as it is a loan agreement with a third-party loan provider. If the student wants to cancel the courses, then they can find Sunlands to ask for refund. The loan itself cannot be reverted.

77.     CW4 also confirmed that it was the practice of Sunlands salespeople to offer installment payments without disclosing the student was actually taking out a personal loan.

78.     Another witness, Confidential Witness 5 ("CW5"), said the same thing.  CW5 worked as a Course Sales Consultant for Sunlands in Beijing from April 2015 to June 2018.  His responsibilities were to recommend courses and make sales to potential clients and to facilitate the sales process and answer questions from potential students.   When speaking to Plaintiff's Counsel's investigator, CW5 admitted that "we," referring to Sunlands salespeople, did not tell students that installment payments were a loan and that it could affect their personal credit record.

3) <u>After Sunlands Lured the Students in With Misrepresentations and Omissions, Sunlands Aggressively Moved to Limit the Number of Refunds it Issued.</u>

79.     Given Sunlands' aggressive and dishonest sales tactics, many students wanted their money back after they realized they had been duped.  The CWs report that Sunlands used dishonest techniques to limit the number of refunds.

80.     CW3 stated that the Sunlands finance department had a monthly cap for refunds and refused to allow additional refunds, even if the students were entitled to them.  Instead, Sunlands hoped that the students would simply give up if the Company was not responsive:

In terms of refund, at Sunlands, the finance department has a monthly cap on the utmost amount that can be refunded to the students every month. If the total refund application surpasses that amount then the finance team will not allow the refund to be made in that month. Therefore, in fact Sunlands used procrastination strategy and for many student's refund requests they just procrastinated for long enough, and the student might forget about the refund or give up wanting to have the refund back. Some students went to file complaints at related authorities, then Sunlands will give them back the refund. In general, it is just trying hard to refund less to the students.

81.    CW1 concurred that Sunlands made the refund process as onerous as possible for

the students through intentional delay and also reported that Sunlands salespeople were not

upfront about the fact that students would lose 25% of their money if they did not request a refund

within 24 hours:

For the refund process, if you want the money back after 7 days of registration, then it'd be very difficult. At this stage, many departments will just pass the buck, telling the student they'll deal with it, but in fact no one will deal with the refund. Many students will have to wait 4 to 6 months before having the money back. Some might complain at various authorities which might not turn out to be effective. Those who eventually do have their money back only have around 30% to 40% of the original fees paid. No more than that.

Even if the student files the refund request after 24 hours and before 7 days after registration, they'd still have to wait a long time in order to get the money back. The refund amount will exclude the registration charge. The 25% registration charge was always applied. Of course, the salespeople won't point out these to the students, they won't advise the students that the refund will not be full amount. They will just say if you are not satisfied you can get the money back. Just speak simple like that and the students will become willing to register.

82.    CW1 further stated that Sunlands salespeople told students they could get a refund

if they failed their exams, but, in reality, the conditions necessary for the refund were almost

impossible to meet:

Also, for the so-called refund if the student fails the exams policy, the salespeople will not make it clear to the student that this sort of refund has conditions they have to meet. The students will have to fulfill 80% of their off-line learning progress, and score 40 to 60 points in courses tests and have a high homework completion rate and so on, only under these conditions the refund can be made if the student fails the exam. I myself did not know about these. I had a student who

failed the exam and wanted refund, I asked my director and only then I found out there were all these conditions. ***I remember thinking back then: what I trap this is.***

(emphasis added).

83.     CW1 further explained that students who had unknowingly taken out loans were in a particularly difficult situation because they had to pay the third-party loan company to avoid harming their credit regardless of whether Sunlands owed them a refund:

> If a student with loan regretted and wanted to get a refund, to be honest, Sunlands will tell him/her that they'll deal with it, but it is difficult to say whether eventually the student would get the money back. They would have to wait for a long time. On the other hand, the loan cannot be cancelled, the student had to repay otherwise it'd affect his/her personal credit record, it (the loan) cannot be retrieved. So, for some students if Sunlands does not give back their refund whilst they still had to pay the loan, this becomes a sad situation and a rip-off.

**C.   Investigative Reporting by China Central Television Confirms the Accounts of the Confidential Witnesses Concerning Sunlands' Refund Policy.**

84.     On April 10, 2019, China Central Television ("CCTV"), the mouthpiece of the Chinese central government and the most authoritative and predominant state television broadcaster in China, published an investigation of Sunlands' refund policies, entitled *Sunlands Exposed By CCTV*, that corroborated the statements by the Confidential Witnesses and contained additional troubling revelations.

85.     During the investigation, a CCTV reporter spoke with a student named Qiao Yang who was told by a Sunlands salesperson on June 21, 2018 that she could get a full refund if she applied for one within 15 days.  But after she applied for the refund four days later, she was told by Sunlands that at 25% registration fee would be deducted.  Yang was told that the 25% fee deduction was pursuant to Sunlands' registration agreement, but she told the reporter that her entire registration process was completed by the staff and she never saw the registration agreement.  Yang's money was not refunded until she took a reporter to a Sunlands branch office

on January 28, 2019.

86.    A staff member from Sunlands told a CCTV reporter posing as a student that the 25% registration fee was actually charged by the State, not Sunlands, but the Beijing Education Examinations Authority told CCTV that it had nothing to do with the registration fee.

87.    The article stated that based on CCTV's investigation, Yang's situation was not an isolated case:

> As we have learned, Qiao Yang's experience is not an individual case, the consumers that signed up for course of Sunlands institution also encountered refunding difficulty, happening all over the country.

88.    CCTV also spoke to another student who signed up for a Sunlands course on July 12, 2018 and applied for a refund four days later and did not receive his refund for more than half a year.

**D.    The Administrative Penalty Decisions and Other Revelations about Sunlands Had a Material Effect on the Company.**

89.    Credit Suisse issued an analyst report on Sunlands on November 27, 2018.  The report discussed the July 4, 2018 Penalty Decision, stating that Sunlands was fined by the Beijing government for aggressive sales practices that misled students and aroused negative media publicity.  That negative publicity caused Sunlands to make significant changes to its operating process to prohibit misleading statements and excessive harassment:

> Firstly, Sunlands checked communication between sales and students both automatically and manually to avoid dishonest statements. Secondly, Sunlands forbade sales to contact customers repeatedly once the person declined sales' requests. Thirdly, Sunlands simplified the refund process to allow more flexible refunds post taking classes. As a result, the refund rate increased from 6% in 2017 to 8-9% in 3Q18.

90.    Credit Suisse issued another analyst report concerning Sunlands on February 15, 2019.  The report stated that despite the changes Sunlands made to its operating process in response to the July 4, 2018 Penalty Decision, "the company is still facing significant slowdown

in growth."

91.    On May 28, 2019, Sunlands filed a Form 6-K with the SEC. Attached was a press release entitled, "Sunlands Technology Group Announces Unaudited First Quarter 2019 Financial Results."  The press release reported that Sunlands' new student enrollment and gross billings had cratered in the First Quarter of 2019.  Gross billings were RMB663.9 million (US$98.9 million), representing a 28.6% decrease year-over-year.  New student enrollments were 100,051, representing a 34.2% decrease year-over-year.

92.    Defendant Li, Chief Financial Officer of Sunlands admitted that "softer marketing tactics" were one of the reasons for the dramatic decrease in new student enrollments and gross billings.

93.    On May 29, 2019, Credit Suisse issued an analyst report for Sunlands that expressed great skepticism about the Sunlands' ability to turn itself around because of how damaging the July 4, 2018 Penalty Decision and the revelations about its sales practices were:

> *We are more cautious on the company's chance of turnaround due to significant brand damage. On 18 April 2019, Beijing government conducted inspection of Sunlands' operations post national media reports (Source: CCTV) and students' complaints. We view government fine in Jul-2018 as a major cause of slowdown in [the second half of 2018].*

(Emphasis added).

94.    When the original complaint in this action was filed on June 27, 2019, Sunlands ADSs' traded at $2.28, a decline of over 80% from the IPO price.

95.    On August 23, 2019, Sunlands issued a press release stating that its gross billings and new student enrollment numbers had again declined dramatically.  The Company's gross billing and new student enrollment *declined 43.1% and 44%*, respectively, year-over-year.

## MATERIALLY FALSE AND MISLEADING
## STATEMENTS ISSUED DURING THE CLASS PERIOD

96.     Sunlands' Registration Statement contained numerous untrue statements of material fact and omitted to state material facts both required by governing regulations and necessary to make the statements made not misleading.

97.     In a section of the Registration Statement describing Sunlands' students, it stated that Sunlands' fast-growing student base was due to the Company's sales and marketing efforts:

**Our Students**

We have a large, fast-growing student base, primarily as a result of our well-established brand and effective sales and marketing efforts. For the years ended December 31, 2015, 2016 and 2017, we had 205,806, 382,805, and 660,182 students, respectively. In 2015, 2016 and 2017, our new student enrollments were 179,172, 188,733, and 387,878, respectively.

We believe our success is largely attributable to our deep understanding of our students. Our students are primarily working adults who generally have limited time to devote to lengthy and regular classroom studies at designated physical locations. Such students also need an engaging learning atmosphere that encourages participation and interaction, and require more assistance and supervision from their teachers and mentors.

According to iResearch, among students surveyed who indicated a desire to pursue a more advanced degree or diploma, approximately 54.9% were white- and blue-collar employees of private enterprises, and approximately 36.6% resided in tier-one cities in China. In addition, our students are typically heavy mobile users who prefer a flexible yet engaging and interactive learning environment.

Our target students generally have aspirations to obtain more knowledge, pursue higher education and improve their social and economic status. At the same time, many of them cannot identify their specific education needs or solutions for such needs, especially given that education products and services can be complex and the relatively high costs may deter them from fulfilling their educational needs. To help them meet their aspirations and understand the potential educational solutions, we focus our marketing and sales practices on counseling-oriented interactions and strive to deliver our courses and educational content in a highly engaging and student-friendly manner.

(emphasis in original).

98.    The foregoing statement concerning Sunlands' marketing, including the portions that state "[w]e believe our success is largely attributable to our deep understanding of our students" and "we focus our marketing and sales practices on counseling-oriented interactions" were and false and misleading because it failed to disclose that, as described in Paragraphs 39-88, deceptive and illegal marketing was pervasive at Sunlands and the Company trained its employees to engage in such marketing.

99.    Later the Registration Statement expounded more on Sunlands' marketing philosophy:

**Marketing, Branding and Sales**

Our marketing philosophy is to promote our services to prospective students in a cost-effective manner based on our deep understanding of their unique profile and needs. We have acquired many of our existing students through effective marketing campaigns focused on showing how our services can address their specific educational needs. At the same time, we market our services to a larger group of prospective students who are not aware of solutions available to satisfy their needs through tailored marketing efforts designed to awaken their potential demands and navigate them through their decision-making process.

We believe that our distinguished online education services lead to strong word-of-mouth promotion, which drives our brand awareness and rapid organic enrollment growth and enables us to market in a cost-effective manner. For the years ended December 31, 2015, 2016 and 2017, our marketing effectiveness ratio, measured by dividing marketing spending by gross billings, was 28.3%, 24.8%, and 20.2%, respectively.

We have built a large, well-trained professional sales and marketing team. As of December 31, 2017, we had 7,254 sales and marketing personnel, the majority of whom were based in our Beijing headquarters. We also maintain sales and marketing personnel in other major regional markets, such as Wuhan, Shenzhen and Guangzhou. Our sales and marketing force adopts sales and marketing strategies customized based on the needs and profile of prospective students in different markets. We divide our sales and marketing personnel into different teams, each dedicated to executing our marketing strategies in a particular geographic region or particular course offerings.

(emphasis in original).

100.    The foregoing statement concerning Sunlands' marketing, including the portion

that states "[o]ur marketing philosophy is to promote our services to prospective students in a cost-effective manner based on our deep understanding of their unique profile and needs," was and false and misleading because it failed to disclose that, as described in Paragraphs 39-88, deceptive and illegal marketing was pervasive at Sunlands and the Company trained its employees to engage in such marketing.

101.    The Registration Statement included an entire section entitled "counseling-oriented sales":

**_Counseling-oriented sales_**

_Counseling services_

To convert leads generated into student enrollments, we provide customized, comprehensive counseling to prospective students throughout the lead nurturing and enrollment cycle. This counseling-oriented sales approach is supported by a capable sales team consisting of live chat personnel, call center staff and recruitment consultants based in our regional enrollment centers. We provide extensive training to our sales team to ensure they are capable of explaining our course offerings, addressing questions and concerns, and recommending courses that best suit prospective students' learning objectives. We also use our data analytics tools and models to identify a prospective student's educational needs, which helps our sales team provide tailor-made counseling services.

_Enrollment process_

We use multi-layer lead-nurturing strategies to acquire new student enrollments in a cost-effective manner. Each of the leads generated are initially directed to our live chat support team who is responsible for answering prospective students' enquires, encouraging them to register with our platforms, and collecting necessary information. Once a prospective student indicates an interest in purchasing our courses, we match such student with the most suitable sales professional based on our data analytics and tools. Such sales professional will follow up with the prospective student. A prospective student that has signed up for our courses will be directed to our local enrollment centers to complete course purchase and registration with the assistance of our enrollment consultants. Our enrollment consultants are also responsible for providing counseling services to enrolling students and guiding them through the payment process. Our students can also choose to complete the purchase and enrollment process entirely online.

102.    The foregoing statement concerning Sunlands' marketing, including the portions

that state "[t]o convert leads generated into student enrollments, we provide customized, comprehensive counseling to prospective students throughout the lead nurturing and enrollment cycle" and "[w]e provide extensive training to our sales team to ensure they are capable of explaining our course offerings, addressing questions and concerns, and recommending courses that best suit prospective students' learning objectives," was and false and misleading because it failed to disclose that, as described in Paragraphs 39-88, deceptive and illegal marketing was pervasive at Sunlands and the Company trained its employees to engage in such marketing.

103.    Regarding risks concerning Sunlands marketing activities, the Registration Statement stated:

> ***If we are unable to conduct sales and marketing activities cost-effectively, our results of operations and financial condition may be materially and adversely affected.***
>
> We rely heavily on our sales and marketing efforts to increase student enrollments. Our sales and marketing expenses primarily include employee salaries and student acquisition expenses. We incurred approximately RMB333.3 million, RMB503.6 million and RMB1,351.8 million (US$207.8 million), respectively, in sales and marketing expenses in 2015, 2016 and 2017. We expect our sales and marketing expenses to continue to increase in the future as we further expand our operations.
>
> Our sales and marketing activities may not be well received by the market and may not result in the levels of sales that we anticipate. We also may not be able to retain or recruit a sufficient number of experienced sales and marketing personnel, or to train newly hired sales and marketing personnel, which we believe is critical to implementing our sales and marketing strategies cost-effectively. Further, sales and marketing approaches and tools in China's online education market are evolving rapidly. This requires us to continually enhance our sales and marketing approaches and experiment with new methods to keep pace with industry developments and student preferences. Moreover, our sales and marketing activities may be deemed to violate PRC laws and regulations, and we may be exposed to administrative penalties, such as paying fines or publishing explanatory notes to limit the adverse effects of our marketing efforts. If we are deemed guilty of significant infringements, we may be ordered to cease sales and marketing activities temporarily and our business license may be revoked. Failure to engage in sales and marketing activities in a compliant and cost-effective manner may reduce our market share, cause our revenues and gross billings to

decline, negatively impact our profitability, and materially harm our business, financial condition and results of operation.[8]

(emphasis in original).

104.    The foregoing statement concerning Sunlands' marketing was false and misleading because it failed to disclose that (1)  as described in Paragraphs 39-88, deceptive and illegal marketing was pervasive at Sunlands and the Company trained its employees to engage in such marketing and (2) in light of Sunlands' pervasive use of illegal marketing techniques, it was inevitable that information about Sunlands' practices would come out and the Beijing AIC would take action against the Company.

105.    The Registration Statement stated the following about the possibility of negative publicity harming the Company:

> ***We may be adversely affected by any negative publicity concerning us and our business, shareholders, affiliates, directors, officers and employees and the industry in which we operate, regardless of its accuracy, that could harm our reputation and business.***
>
> Negative publicity about us and our business, shareholders, affiliates, directors, officers, and teachers and other employees, as well as the industry in which we operate, can harm our operations. We have been exposed to negative publicity concerning refund dispute and administrative penalty and alleged improper or misleading statement made in our sales and marketing activities in the past. Negative publicity concerning these parties could be related to a wide variety of matters, including, but are not limited to:
>
> * alleged misconduct or other improper activities committed by our students or our directors, officers, and teachers and other employees, including misrepresentation made by our employees to potential students during sales and marketing activities;
> * false or malicious allegations or rumors about us or our directors, shareholders, affiliates, officers, and teachers and other employees;

---

[8]    Notably, although this statement mentions administrative penalties, the Registration Statement later stated, under "Legal Proceedings," that "[w]e are currently not a party to, and we are not aware of any threat of, any legal or administrative proceedings that, in the opinion of our management, are likely to have any material and adverse effect on our business, financial condition, cash flow or results of operations."

- complaints by our students about our education services and sales and marketing activities;

- tuition refund disputes between us and our students or administrative penalties;

- security breaches of confidential student or employee information;

- employment-related claims relating to alleged employment discrimination, wage and hour violations; and

- governmental and regulatory investigations or penalties resulting from our failure to comply with applicable laws and regulations.

In addition to traditional media, there has been an increasing use of social media platforms and similar devices in China, including instant messaging applications, such as Weixin/WeChat, social media websites and other forms of internet-based communications that provide individuals with access to a broad audience of consumers and other interested persons. The availability of information on instant messaging applications and social media platforms is virtually immediate as is its impact without affording us an opportunity for redress or correction. The opportunity for dissemination of information, including inaccurate information, is seemingly limitless and readily available. Information concerning our company, shareholders, directors, officers and employees may be posted on such platforms at any time. The risks associated with any such negative publicity or incorrect information cannot be completely eliminated or mitigated and may materially harm our reputation, business, financial condition and results of operations.

106.    The foregoing statement was false and misleading, including the portions stating that the Company would be hurt by negative publicity "regardless of its accuracy" and that the Company could be the victim of "false or malicious allegations."  The implication that the biggest risk to the Company was false allegations was false and misleading because deceptive and illegal marketing was pervasive at Sunlands and the Company trained its employees to engage in it, as described in Paragraphs 39-88.

107.    The Registration Statement said the following regarding the risks associated with Sunlands' "installment tuition payment plan":

*We may face risks associated with the installment tuition payment plan we offer to our students.*

In 2015, we launched an installment payment option enabling eligible students to obtain loans from accredited third-party credit providers in China to finance all or part of their tuition. The third-party credit providers are responsible for performing credit assessment, approving loan applications, providing the funds, and collecting delinquent loan payments. Under the loan agreement between the borrowing student and the lending credit provider, the borrowing student is obligated to repay the loan principal in installments over a period ranging from three to 12 months. Under the cooperation agreement between us and each credit provider, we are obligated to pay the full amount of interest payable under a loan, as financial service fees, to the credit provider. We generally do not provide any guarantees for the repayment of student loans in favor of the credit providers. In 2015, 2016 and 2017, 4.8%, 32.3% and 72.9%, respectively, of our gross billings were received from third-party credit providers. For the same periods, we made interest payments of RMB2.0 million, RMB20.2 million and RMB106.2 million (US$16.3 million), respectively, to the credit providers.

As part of our long-term sales and marketing strategy, we plan to continue to make the interest payments for our students under their loans and pay service fees to the credit providers, which may place significant strains on our financial resources as our student enrollments continue to grow. We may be subject to risks associated with an increase in interest rates to the extent that we continue to make interest payments for the loans taken by our students. If we cease to do so due to increases in interest rates or for other reasons, our course packages may become more costly for our students to purchase, which could in turn negatively impact our business, financial condition and reputation.

The availability of funding from our existing and potential credit providers depends on many factors, such as their liquidity and capital sufficiency, the legal and regulatory environment, the general economic conditions, default rates of our students on the loans, and, where applicable, the availability of lenders on the credit providers' platforms. In addition, our credit providers may seek to acquire borrowers independently instead of through cooperation with us. We currently work with a limited number of credit providers and we cannot assure you that our credit providers will continue to cooperate with us on commercially favorable terms, or at all, or that existing or potential credit providers will be able to provide loans in a sufficient amount to meet our students' borrowing needs. If any of these were to occur, our course packages may become less compelling to prospective students who wish to obtain student loans, and as a result our business and financial condition may be negatively affected.

108.    Sunlands explained the installment payment option again later in the Registration

Statement:

*Student Financing*

> We offer an installment payment option to students, under which the students obtain loans from accredited credit sources ("Loan Companies") for the purpose of satisfying the student's tuition payment due. The borrowing student is obligated to repay the loan principal in installments over periods ranging from three months to 12 months to the Loan Companies, while we agree with the Loan Companies to bear the student's interest expense and service fees. The Loan Companies remit the tuition to us for students to complete the registration. The interest expense and service fees are recorded as a reduction of the transaction price.

109.    The foregoing statements concerning Sunlands' installment payment plan were false and misleading because they failed to disclose that, as described in Paragraphs 73-78, it was standard practice for Sunlands sales personnel to sell installment payment plans to students without disclosing to them that such a plan was actually a personal loan taken out in the student's name for the entire cost of the course.

110.    The Registration Statement made the following statement concerning the risks from student refunds:

> ***Tuition refunds or potential refund disputes may negatively affect our cash flow, financial condition, and reputation.***
>
> We offer different tuition refund options to our students depending on the time of enrollment and subject to certain conditions and restrictions in the service contract between us and each of our students. Generally, a student is offered a full, unconditional refund within 24 hours upon enrollment. If the student makes a refund request after taking at least one trial course lasting 30 minutes by reason of any material academic issue of our courses within certain refund period, we would offer such student a partial refund excluding the registration fees and the relevant academic fees for the trial lesson upon our confirmation. In addition, at our discretion, a partial refund may also be granted to the student who withdraws at any other time during his or her enrollment, subject to special approval by us. When calculating gross billings for a specific period, we deduct the total amount of refunds from the total amount of cash received for the sale of course packages for such period. See "Business—Our Tuition and Fees."
>
> In 2015, 2016 and 2017, we had made RMB53.7 million, RMB61.3 million and RMB150.1 million (US$23.1 million) of refund payments, respectively. The number of refund requests and the amount of refunds could be affected by a number of factors, many of which are beyond our control. These factors include, without limitation to, student dissatisfaction with our teaching quality and our

course and educational content offerings, privacy concerns relating to our online platforms, negative publicity regarding us or online education in general, and any change or development in PRC laws and regulations with respect to fees and tuitions charged by online education providers like us. See "We face risks associated with our lack of private school operating permit for our online education services as well as uncertainties surrounding PRC laws and regulations governing the education industry, including the Law for Promoting Private Education and its Implementing Rules. "Any refund payments that we may be required to make to our students, as well as the expenses we could incur for processing refunds and resolving refund disputes, could be substantial and could adversely affect our gross billings, net revenues, liquidity and financial condition. A high volume of refunds and refund disputes may also generate negative publicity that could harm our reputation. We have experienced in the past, and may experience in the future, negative publicity in relation to refund disputes between us and our students, which may significantly harm our brand name and divert our attention from operating our business.

(Emphasis in original)

111. The foregoing statement was false and misleading because it failed to disclose that, as described in Paragraphs 79-88, it was standard practice for salespeople at Sunlands to make false statements to students concerning the Company's refund policy and for the Company to wrongly delay paying refunds owed to students. The foregoing statement is also false and misleading because it failed to disclose that there was significant additional risk that Sunlands students would request refunds because, as described in Paragraphs 39-88, deceptive and illegal marketing was pervasive at Sunlands and the Company trained its employees to engage in it.

112. The Registration Statement again described Sunlands' installment tuition payment plan and refund policy when discussing tuition and fees:

**Our Tuition and Fees**

Our tuition fees, including academic fees and registration fees, are charged generally on a per-program basis. From time to time, we offer tuition discounts under various marketing campaigns and promotions. For example, discounts may also be made available to students who purchase multiple courses at a time. We accept fee payments through major third-party online payment solutions in China, including Alipay, Union Pay and WeChat Pay, as well as bank transfers and credit cards.

Students typically self-finance their education or obtain financing from third-party financing programs that cooperate with us. We currently offer the following two payment options to our students:

- *Lump-sum prepayment option*. Under a prepaid payment plan, a student is required to make a one-time, lump-sum payment of the tuition to us directly at the beginning of the academic period. In 2015, 2016 and 2017, approximately 95.2%, 67.7% and 27.1% of our gross billings were paid in a lump sum upfront.

- *Installment payment plan*. In 2015, we launched an installment payment option that enables eligible students to obtain loans from accredited credit providers in China to finance all or part of their tuition. The credit providers perform credit assessment, approve loan applications, provide the funds and collect delinquent payments. Once a student's loan application is approved by the credit provider, the tuition will be fully paid to us by such credit provider. We also partner with credit intermediaries, who connect our students with credit providers. One such credit intermediary is Coffee Ease, in which we indirectly hold an equity interest through our investment as a limited partner in an investment fund, which is managed by one of our minority shareholders, that holds a non-controlling equity interest in Coffee Ease.

  Under the loan agreement between the borrowing student and the lending credit provider, the borrowing student is required to repay the loan principal in installments over a period generally ranging from three to 12 months. Under the cooperation agreement between us and each credit provider, we are responsible for making interest payments under a student loan to the lending credit provider. Interest payments and service fees are recorded as a reduction to the total contractual tuition price. We generally do not guarantee the payment of the loan principal by the students. See "Risk Factors - Risks Related to Our Business—We may face risks associated with the installment tuition payment plan we offer to our students." In 2015, 2016 and 2017, 4.8%, 32.3% and 72.9%, respectively, of our gross billings were received from lending credit providers. During the same periods, we made interest payments of RMB2.0 million, RMB20.2 million and RMB106.2 million (US$16.3 million), respectively, to the credit providers.

We generally offer students a full, unconditional refund within 24 hours upon enrollment. If a student requests a refund after taking at least a 30-minute trial course due to any material academic issue associated with our courses within certain refund period, we offer a partial refund. In addition, we may at our discretion grant a partial refund to a student who withdraws at any

other time during his or her enrollment, subject to special approval by us. Historically, we allowed our students to obtain a refund under certain conditions. When calculating gross billings for a specific period, we deduct the total amount of refunds from the total amount of cash received for the sale of course packages for such period.

113.     The foregoing statement was false and misleading because it failed to disclose that, as described in Paragraphs 73-78, that is was standard practice for Sunlands sales personnel to sell "installment payment" plans to students without disclosing to the student that such a plan was actually a personal loan taken out in the student's name for the entire cost of the course.  It was also false and misleading because it failed to disclose that, as described in Paragraphs 79-88, it was standard practice for salespeople at Sunlands to make false statements to students concerning the Company's refund policy and for the Company to wrongly delay paying refunds owed to students.   The foregoing statement was false and misleading for the additional reason that it failed to disclose that there was significant additional risk that Sunlands students would request refunds because, as described in Paragraphs 39-88, deceptive and illegal marketing was pervasive at Sunlands and the Company trained its employees to engage in it.

114.     The Registration Statement was also replete with references to Sunlands new student growth and/or its rapid increase in gross billings, including:

We have been successful in addressing the unmet demand of a large, growing market and served approximately 790,000 students across China since we transitioned to an online education model in 2014. The number of our students was 205,806, 382,805 and 660,182, respectively, in 2015, 2016 and 2017. For the same periods, our new student enrollments were 179,172, 188,733 and 387,878, respectively.

115.     The Registration Statement attributed Sunlands' growth to it high quality faculty and educational content and "ability to cultivate an engaging community among students, teachers and mentors, strong educational content development capabilities":

Our success has been driven by our ability to cultivate an engaging community among students, teachers and mentors, strong educational content development capabilities, and high-quality faculty, which combined allow us to continually improve the student learning experience. We encourage students to become more committed and engaged by creating an interactive learning environment that fosters their desire to learn. We also provide our students with strong learning support through our dedicated mentors.

….

Our gross billings increased to RMB741.0 million in 2016 from RMB446.1 million in 2015, representing an increase of 66.1%, and further increased to RMB2,381.8 million (US$366.1 million) in 2017, representing a significant increase of 221.4%. Our net revenues increased by 163.4% from RMB159.0 million in 2015 to RMB418.9 million in 2016 and further increased by 131.6% to RMB970.2 million (US$149.1 million) in 2017. Our net loss in 2015, 2016 and 2017 was RMB318.3 million, RMB253.6 million and RMB918.7 million (US$141.2 million), respectively. Our deferred revenue was RMB414.1 million, RMB727.6 million and RMB2,110.4 million (US$324.4 million), respectively, as of December 31, 2015, 2016 and 2017. Our net cash provided by operating activities was RMB0.4 million, RMB89.3 million and RMB819.5 million (US$126.0 million), respectively, for the years ended December 31, 2015, 2016 and 2017.

116.    The Registration Statement further boasted about Sunlands' past rapid growth and

expected future growth:

***We have grown rapidly and expect to continue to invest in our growth for the foreseeable future. If we fail to manage this growth effectively, the success of our business model will be compromised.***

We have experienced rapid growth in gross billings and net revenues in recent years, primarily driven by our fast-growing student enrollments since our transition to an online course delivery model in 2014 which allows students to access our courses from anywhere connected to the internet. Our net revenues grew by 163.4% from RMB159.0 million in 2015 to RMB418.9 million in 2016 and further increased by 131.6% to RMB970.2 million (US$149.1 million) in 2017. Over the same periods, our gross billings grew by 66.1% to RMB741.0 million from RMB446.1 million and further increased by 221.4% to RMB2,381.8 million (US$366.1 million).

Our rapid growth has placed, and will continue to place, a significant strain on our sales and marketing capacities, administrative and operating infrastructure, facilities and other resources. To maintain our growth, we need to continue to acquire more students, scale up our course offerings, increase our

academic and administrative faculty, as well as strengthen our platforms and systems. We will also be required to refine our operational, financial and management controls and reporting systems and procedures. If we fail to efficiently manage this expansion of our business, our costs and expenses may increase more than we plan and we may not successfully attract a sufficient number of students and qualified academic and administrative faculty in a cost-effective manner, respond to competitive challenges, or otherwise execute our business plans. In addition, we may, as part of carrying out our growth strategies, adopt new initiatives to offer additional course packages and educational content and to implement new pricing models and strategies. We cannot assure you that these initiatives may achieve the anticipated results. These proposed changes may not be well received by our existing and prospective students, in which case their experience with our education services may suffer, which could damage our reputation and business prospect.

Our ability to effectively implement our strategies and manage any significant growth of our business will depend on a number of factors, including our ability to: (i) identify and effectively market our products and services in new markets with sufficient growth potential; (ii) develop and improve course offerings and educational contents to make them appealing to existing and prospective students, particularly working adult students; (iii) maintain and increase our student enrollments; (iv) effectively recruit, train and motivate a large number of new employees, including our faculty members and sales and marketing personnel; (v) successfully implement enhancements and improvements to the systems and platforms; (vi) continue to improve our operational, financial and management controls and efficiencies; (vii) protect and further develop our intellectual property rights; and (viii) make sound business decisions in light of the scrutiny associated with operating as a public company. These activities require significant capital expenditures and investment of valuable management and financial resources, and our growth will continue to place significant demands on our management. There are no guarantees that we will be able to effectively manage any future growth in an efficient, cost-effective and timely manner, or at all. Our growth in a relatively short period of time is not necessarily indicative of results that we may achieve in the future. If we do not effectively manage the growth of our business and operations, our reputation, results of operations and overall business and prospects could be negatively impacted.

117.    Later in the Registration Statement, Sunlands claimed that it was a leader in

"China's online post-secondary and professional education in terms of gross billings" because of

"a deep understanding of the educational needs of [their] prospective students":

We are the leader in China's online post-secondary and professional education in terms of gross billings in 2017, according to iResearch. We have a

deep understanding of the educational needs of our prospective students and offer solutions that help them achieve their aspirations. We currently focus on offering various degree- and diploma-oriented post-secondary courses through our online platforms. In addition, we offer professional education services including courses to help students prepare for professional certification exams and attain professional skills.

Started in 2003 as an offline, classroom-based education company, we have transitioned to an exclusively online education delivery model in 2014. Our online education model allows our students to access our educational services anywhere and anytime through participating in live streaming and recorded classes.

We have been successful in addressing the unmet demand of a large, growing market, and served approximately 790,000 students across China since 2014. The number of our students increased from 205,806 in 2015 to 382,805 in 2016, and further increased to 660,182 in 2017.

…

Our net revenues increased by 163.4% from RMB159.0 million in 2015 to RMB418.9 million in 2016 and further increased by 131.6% to RMB970.2 million (US$149.1 million) in 2017. Our gross billings increased to RMB741.0 million in 2016 from RMB446.1 million in 2015, representing an increase of 66.1%, and further increased to RMB2,381.8 million (US$366.1 million) in 2017, representing a significant increase of 221.4%. Our net loss in 2015, 2016 and 2017 was RMB318.3 million, RMB253.6 million and RMB918.7 million (US$141.2 million), respectively. Our deferred revenue was RMB414.1 million, RMB727.6 million and RMB2,110.4 million (US$324.4 million), respectively, as of December 31, 2015, 2016 and 2017. Our net cash provided by operating activities was RMB0.4 million, RMB89.3 million and RMB819.5 million (US$126.0 million), respectively, for the years ended December 31, 2015, 2016 and 2017.

118.    The Registration Statement also attributed Sunlands' new student acquisition to "increased investment in improving the quality of our course and educational content offerings and sales, branding and marketing spending":

**Year Ended December 31, 2017 Compared to Year Ended December 31, 2016**

*Net revenues*

Our net revenues increased by 131.6% from RMB418.9 million in 2016 to RMB970.2 million (US$149.1 million) in 2017, mainly driven by the increase

in our gross billings, which was in turn attributable to increases in both the number of our new student enrollments and gross billings per new student enrollment. The number of new student enrollments grew by approximately 105.5% from 188,733 in 2016 to 387,878 in 2017, primarily as a result of our increased investment in improving the quality of our course and educational content offerings and sales, branding and marketing spending. Our gross billings per new student enrollment grew by 56.4% from RMB3,926.0 in 2016 to RMB6,140.5 (US$943.8) in 2017, primarily as a result of increased new student enrollments in our associate diploma plus bachelor's degree programs which charge higher tuition as well as our increased ability to charge higher tuition for other course packages as we continued to improve our service quality and gain popularity among students.

(emphasis in original).

119.    The foregoing statements in Paragraphs 114-118 concerning Sunlands' growth and the reasons for its growth were false and misleading because they failed to disclose that an important reason for Sunlands' growth in new student enrollment and gross billings were the deceptive and illegal marketing methods used by Sunlands employees, as described in Paragraphs 39-88.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

120.    Plaintiff brings this action as a class action on behalf of all those who purchased Sunlands ADSs pursuant and/or traceable to the Registration Statement (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors and affiliates of Defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

121.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least

thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Sunlands or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

122.    Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

123.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

124.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a)      whether Defendants violated the Securities Act;

b)      whether the Registration Statement contained false or misleading statements of material fact and omitted material information required to be stated therein; and

c)      to what extent the members of the Class have sustained damages and the proper measure of damages.

125.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the Securities Act Against All Defendants

126.    Plaintiff incorporates all the foregoing by reference.

127.    This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

128.    The Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

129.    Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

130.    None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

131.    By reason of the conduct herein alleged, each Defendant violated or controlled a person who violated §11 of the Securities Act.

132.    Plaintiff acquired Sunlands ADSs pursuant to the Registration Statement.

133.    At the time of their purchases of Sunlands ADSs, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

134.    This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

## COUNT II

### Violations of Section 15 of the Securities Act Against the Individual Defendants

135.     Plaintiff incorporates all the foregoing by reference.

136.     This cause of action is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o against all Defendants except the Underwriter Defendants.

137.      The Individual Defendants were controlling persons of Sunlands by virtue of their positions as directors or senior officers of Sunlands. The Individual Defendants each had a series of direct and indirect business and personal relationships with other directors and officers and major shareholders of Sunlands. The Company controlled the Individual Defendants and all of Sunlands's employees.

138.     Sunlands and the Individual Defendants were culpable participants in the violations of §11 of the Securities Act as alleged above, based on their having signed or authorized the signing of the Registration Statement or consented to being named as a Director in the Registration Statement and having otherwise participated in the process which allowed the IPO to be successfully completed.

139.     This claim is brought within one year after discovery of the untrue statements and/or omissions in the Offering that should have been made and/or corrected through the exercise of reasonable diligence, and within three years of the effective date of the Offering. It is therefore timely.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, prays for judgment and relief as follows:

- 43 -

A.      declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating plaintiff's counsel as Lead Counsel;

B.      awarding damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, together with interest thereon;

C.      awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

### <u>DEMAND FOR TRIAL BY JURY</u>

Plaintiff hereby demands a trial by jury.


Dated: November 15, 2019            **THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
Brian B. Alexander, Esq. (BA 6057)
Jing Chen, Esq. (JC 2908)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
             lrosen@rosenlegal.com
             balexander@rosenlegal.com
             jchen@rosenlegal.com


*Counsel for Plaintiff*