**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
Brian B. Alexander
Jing Chen
275 Madison Avenue, 40th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
lrosen@rosenlegal.com
pkim@rosenlegal.com
balexander@rosenlegal.com
jchen@rosenlegal.com

*Counsel for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DAVID HOROWITZ, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiff,<br><br>    v.<br><br>SUNLANDS TECHNOLOGY GROUP, TONGBO LIU, YIPENG LI, JIANHONG YIN A/K/A PENG OU, LU LU, MICHAEL MINHONG YU, YANG WANG, GAONENG JI, SAM HANHUI SUN, XIAOCHUAN WANG, GOLDMAN SACHS (ASIA) L.L.C., CREDIT SUISSE SECURITIES (USA) LLC, AND J.P. MORGAN SECURITIES LLC,<br><br>    Defendants. | No. 1:19-CV-03744-FB-SMG<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
<u>**MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**</u>

**Table of Contents**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ...................................................................................... 3

    A.   Sunlands' IPO on the New York Stock Exchange and Registration Statement ........... 3

    B.   At the Time of Sunlands' IPO, Deceptive and Illegal Marketing Was Pervasive at Sunlands and the Company Trained its Employees to Engage in It .................................................................................................. 5

    C.   Sunlands Was Fined by its Regulator for Illegally Deceiving its Students Less Than Four Months After its IPO and Later Admitted That Use of "Softer Marketing Tactics" Led to a Dramatic Decrease in New Student Enrollment and Gross Billing ......................................................... 8

    D.   There is no Indication that the Market for Sunlands ADSs was Aware of the Beijing News Article More Than a Year Before the Initial Complaint Was Filed. ............................................................................ 9

    E.   The Initial and Amended Complaint Pursue the Same Legal Theory for the Same Factual Reasons.............................................................. 10

ARGUMENT ..................................................................................................... 11

   I.   DEFENDANTS HAVE NOT DEMONSTRATED THAT THE PLAINTIFF'S CLAIMS ARE UNTIMELY................................................................ 11

    A.   The Amended Complaint Relates Back to the Initial Complaint ............................... 11

    B.   The Beijing News Article Did Not Trigger the Statute of Limitations...................... 13

      1.  The Beijing News Article Did Not Trigger the Discovery Rule Because it was From a Chinese News Source and Only Available in Chinese ........................... 14

      2.  There is No Indication That the Market for Sunlands' ADSs' Was Aware of the Beijing News Article.......................................................... 17

3.  Even if Plaintiff had Been Aware of the Beijing News Article, his Claims Would Not be Timed-barred Because he Could not have Shown Compensable Damages. .................................................................................. 19

II.  THE COMPLAINT ADEQUATELY STATES A CLAIM UNDER SECTION 11 OF THE SECURITIES ACT ................................................................... 20

A.  Plaintiff Adequately Pled Material Misrepresentations and Omissions. .................... 20

1.  Statements Concerning Marketing ............................................................. 21

2.  Statements Concerning Growth ................................................................. 24

3.  Statements Concerning Refund Policy and "Installment Tuition Payment Plan" ........................................................................................................... 26

4.  The Registration Statement was False and Misleading When it Became Effective. ................................................................................................... 27

B.  The Registration Statement's Risk Disclosures Were Inadequate ............................. 28

C.  The Statements Identified by Plaintiff are Not Inactionable Puffery. ........................ 30

CONCLUSION ................................................................................................................ 30

## Table of Authorities

**Pages**

### Cases

*Amorosa v. AOL Time Warner Inc.*,
409 F. App'x 412 (2d Cir. 2011)...................................................................................... 17

*ASARCO LLC v. Goodwin*,
756 F.3d 191 (2d Cir. 2014)............................................................................................ 12

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)........................................... 20

*Caiola v. Citibank, N.A., New York*,
295 F.3d 312 (2d Cir. 2002)............................................................................................ 22

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014)............................................................................................ 27

*Dartell v. Tibet Pharm., Inc.*,
No. CV 14-3620, 2016 WL 718150 (D.N.J. Feb. 22, 2016)......................................... 18

*Emerson v. Mut. Fund Series Tr.*,
393 F. Supp. 3d 220 (E.D.N.Y. 2019) ........................................................................... 20

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)............................................................................................. 13

*Feit v. Leasco Data Processing Equip. Corp.*,
332 F. Supp. 544 (E.D.N.Y. 1971) ................................................................................ 14

*Gross v. GFI Grp., Inc.*,
162 F. Supp. 3d 263 (S.D.N.Y. 2016)............................................................................ 30

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)........................................................................................................ 20

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)............................................................................ 20

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012)............................................................................ 13

*In re Braskem S.A. Sec. Litig.*,
246 F. Supp. 3d 731 (S.D.N.Y. 2017)............................................................................ 25

iii

*In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*,
   No. CV 11-2768 PSG (SSX), 2012 WL 12893520 (C.D. Cal. Feb. 16, 2012) ...................... 16

*In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*,
   No. 14-CV-4471 (KMW), 2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) .................................. 16

*In re Fuwei Films Sec. Litig.*,
   634 F. Supp. 2d 419 (S.D.N.Y. 2009)............................................................................... 15, 16

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
   643 F. Supp. 2d 562 (S.D.N.Y. 2009)...................................................................................... 25

*In re Lehman Bros. Sec. & Erisa Litig.*,
   799 F. Supp. 2d 258 (S.D.N.Y. 2011)...................................................................................... 22

*In re Magnum Hunter Res. Corp. Sec. Litig.*,
   26 F. Supp. 3d 278 (S.D.N.Y. 2014)........................................................................................ 17

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)..................................................................................................... 24

*In re Mylan N.V. Sec. Litig.*,
   No. 16-CV-7926 (JPO), 2018 WL 1595985 (S.D.N.Y. Mar. 28, 2018)................................. 24

*In re ProShares Tr. Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013)....................................................................................................... 30

*In re Prudential Sec. Inc. Ltd. Partnerships Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996)............................................................................................. 30

*In re Qudian Inc. Sec. Litig.*,
   No. 17-CV-9741 (JMF), 2019 WL 4735376 (S.D.N.Y. Sept. 27, 2019)........................... 16, 30

*In re Signet Jewelers Ltd. Securities Litig.*,
   389 F. Supp. 3d 221 (S.D.N.Y. 2019)................................................................................. 23, 24

*In re SunEdison, Inc. Sec. Litig.*,
   300 F. Supp. 3d 444 (S.D.N.Y. 2018)...................................................................................... 17

*In re Van der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005)................................................................................. 24, 28

*In re VEON Ltd. Sec. Litig.*,
   No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017).............................. 24

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
   No. 215CV04003ODWMRWX, 2016 WL 6609210 (C.D. Cal. May 10, 2016) .................... 16

iv

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990)..................................................................................... 21, 26

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
    164 F. Supp. 3d 568 (S.D.N.Y. 2016)............................................................................. 28

*Metz v. U.S. Life Ins. Co. in City of New York*,
    662 F.3d 600 (2d Cir. 2011)........................................................................................... 20

*Meyer v. Jinkosolar Holdings Co.*,
    761 F.3d 245 (2d Cir. 2014)..................................................................................... passim

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
    693 F.3d 145 (2d Cir. 2012)........................................................................................... 20

*Newman v. Warnaco Grp., Inc.*,
    335 F.3d 187 (2d Cir. 2003)........................................................................................... 17

*Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*,
    874 F. Supp. 2d 341 (S.D.N.Y. 2012)............................................................................. 17

*Rapoport v. Asia Elecs. Holding Co.*,
    88 F. Supp. 2d 179 (S.D.N.Y. 2000)............................................................................... 30

*Resnik v. Swartz*,
    303 F.3d 147 (2d Cir. 2002)........................................................................................... 24

*SEC v. Capital Gains Research Bureau*,
    375 U.S. 180 (1963)....................................................................................................... 14

*Slayton v. Am. Exp. Co.*,
    460 F.3d 215 (2d Cir. 2006)..................................................................................... 11, 12

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)..................................................................................... 13, 14

*Tregenza v. Great Am. Commc'ns Co.*,
    12 F.3d 717 (7th Cir. 1993) ........................................................................................... 13

*Yi Xiang v. Inovalon Holdings, Inc.*,
    254 F. Supp. 3d 635 (S.D.N.Y. 2017)................................................................. 13, 19, 20

*Youngers v. Virtus Inv. Partners Inc.*,
    195 F. Supp. 3d 499 (S.D.N.Y. 2016)............................................................................. 17

**Statutes**

15 U.S.C. § 77k(a) ................................................................................................................. 20

15 U.S.C. § 77m.................................................................................................... 13

**Rules**

Federal Rule of Civil Procedure 15 ...................................................................... 11, 13

**Regulations**

17 C.F.R. § 230.403 ............................................................................................ 14

Lead Plaintiff David Horowitz ("Plaintiff") respectfully submits this Memorandum of Law in opposition to Defendants' Motion to Dismiss the First Amended Complaint.

## PRELIMINARY STATEMENT

Sunlands Technology Group ("Sunlands" or the "Company") is headquartered in and provides online and post-secondary education classes in China.  In its Registration Statement for its IPO, Sunlands portrayed itself as rapidly growing in gross billings and new student enrollments due to its unique ability to understand the needs of students and the quality of its courses and faculty. Not surprisingly, Sunlands had no trouble raising approximately $150 million in its IPO from the sale of 13 million shares at $11.50/share on the New York Stock Exchange ("NYSE"). Sunlands' Registration Statement was, however, materially inaccurate. It failed to disclose that the Company's success was predicated on the sanctioned and aggressive use of illegal misrepresentations to trick students into signing up for courses, including lies to students about its refund policy and the fact that installment payments were only made possible by loans that students were personally liable for. Sunlands investors have paid a steep price for these misrepresentations. As of the commencement of this action, Sunlands' shares had lost over 80% of their value, trading around $2.28/share.

Section 11 of the Securities Act of 1933 ("Section 11") imposes ***strict liability*** for material misstatements and omissions in Registration Statements to promote disclosure by companies conducting IPOs and to protect the integrity of the United States' securities market. In contrast, Defendants' Motion to Dismiss is a protracted effort to evade responsibility for misleading investors by stretching the facts and technicalities in the law.

*First*, Defendants argue that the Initial Complaint does not relate back to the Amended Complaint — a rule whose purpose, the Second Circuit has held, is to maximize opportunity for

1

each claim to be decided on its merits rather than on procedural technicalities. Here the question is not even close since the Initial and Amended complaints pursue the same legal claims based on the same factual reason — that Sunlands' Registration Statement was misleading because of misrepresentations and omissions concerning its marketing tactics.

*Second*, Defendants argue they should avoid responsibility for their misleading Registration Statement because investors in a stock listed on the NYSE were put on notice of their claims by an article written in Chinese for a Chinese publication, the *Beijing News* (the "Beijing News Article"). Defendants' own motion refutes their argument since they do not point to a single English language source from before June 27, 2018 (a year before Plaintiff filed the Initial Complaint). Instead, they attached an earnings call transcript and J.P. Morgan analyst report that were both from ***August 2018***. Notably, the only J.P. Morgan analyst report issued after the Beijing News Article and before June 27, 2018 made no mention of Sunlands' deceptive marketing tactics. Accordingly, Defendants are left with the implausible argument that investors in Sunlands should have been feeding the *Beijing News* (and presumably many other Chinese publications) into Google Translate every day. Plaintiff's position is also supported by the fact that the historical record shows that the Beijing News Article did not have any effect on Sunlands' stock price.

*Third*, Defendants' evasion did not end when they finally addressed the substance of Plaintiff's Section 11 claim. Their motion attempts to boil this case down to whether a company has a generalized duty to disclose misconduct. In reality, as detailed below, numerous statements that Sunlands made about its marketing, the reasons for its growth, and its refund and installment payment options were rendered misleading by its complete lack of disclosure concerning its actual marketing tactics. Defendants also assert that they disclosed the risks from Sunlands'

marketing tactics because they made generic disclosures that their marketing "may" be deemed to violate the law. The Court should reject Defendants' position that such disclosures give companies a free pass to fail to disclose pervasive misconduct that makes statements in their Registration Statement misleading.

### STATEMENT OF FACTS

**A.  Sunlands' IPO on the New York Stock Exchange and Registration Statement.**

Sunlands provides online post-secondary and professional education services in China. (Amended Complaint ("AC") ¶ 37.) In 2017, self-taught higher education examination ("STE") courses accounted for 89.2% of Sunlands' gross billings and 80.1% of its new student signups. (*Id.*) STEs are an education system that was initiated by the Chinese government in the early 1980s as an alternative to the formal higher education that students admitted into universities and colleges receive. (*Id.*) The STE system contains two components: (1) the self-taught program, consisting of courses within a specific study area provided by education-service institutions, such as Sunlands, and (2) national examinations administered by the Chinese government that the students must pass to receive credit for the courses. (*Id.*)

Sunlands conducted an IPO in the United States in March 2018, pursuant to which it sold 13 million American Depository Shares ("ADSs") and raised approximately $150 million (*Id.* ¶ 36.)  The SEC declared Sunlands' Registration Statement effective on March 22, 2018. (*Id.*) The Company priced its offering at $11.50 per ADS and listed the ADSs on the New York Stock Exchange ("NYSE"). (*Id.* ¶¶ 19, 36.) The Registration Statement stated that "[w]e have not taken any action to permit a public offering of the ADSs outside the United States or to permit the possession or distribution of this prospectus outside the United States." (Defs. Ex. A[1] (Sunlands'

---

[1] "Defs. Ex." refers to exhibits attached to Defendants Motion to Dismiss. "Pl. Ex." refers to exhibits to the Declaration of Brian B. Alexander, dated May 12, 2020, and filed with this opposition.

Registration Statement) [hereinafter "RS"] at ii.)

Directly after the table of contents, Sunlands' Registration Statement stated in bold that they "**are responsible for the information contained in this prospectus**" and **"have not authorized anyone to provide you with different information.**" (*Id.* at i.) Sunlands' Registration Statement portrayed it as a company that was rapidly and sustainably expanding because of robust marketing that was focused on fulfilling the needs of students. The Registration Statement explained that "[Sunlands'] marketing philosophy is to promote our services…based on our deep understanding of [students'] unique profile and needs." (*Id.* ¶ 99.) The Registration Statement also repeatedly referred to Sunlands' marketing and sales practices as "counseling-oriented," including an entire section entitled "*counseling-oriented sales*"). (*Id.* ¶¶ 97, 101. (emphasis in original).) Sunlands further stressed that its marketing team was extensively trained. *Id.* (¶¶ 99, 101.) The Registration Statement stated that if the Company violated China's laws concerning marketing activities, it would be damaging to Sunlands. (*See, e.g. id.* ¶¶ 103, 105.) That gave investors comfort that the Company understood the seriousness of violating China's marketing regulations and was taking precautions to avoid doing so.

In addition to its extensive discussion of Sunlands marketing philosophy, the Registration Statement touted the Company's growing new student enrollment and gross billings in numerous statements. (*Id.* ¶¶ 97, 114, 115, 116, 117, 118.) Those statements attributed Sunlands success to its unique understanding of the needs of its students and the quality of its faculty and courses. (*See, e.g. id.* ¶ 115 ("Our success has been driven by our ability to cultivate an engaging community among students, teachers and mentors, strong educational content development capabilities, and high-quality faculty, which combined allow us to continually improve the student learning experience").

Finally, the Registration Statement made statements describing Sunlands' refund policy and "installment payment plan." (*Id.* ¶¶ 107, 108, 110, 112.) Sunlands stated that its refund policy was to offer an unconditional refund within 24 hours and to offer partial refunds for various reasons after that. (*Id.* ¶¶ 110, 112.)  The Registration Statement explained that under Sunlands' "installment payment plan" students took out loans from third-party credit providers that worked with Sunlands. (*Id.* ¶¶ 107-108, 112.) Sunlands paid the students' interest expenses and service fees, but the students were personally liable to the third-party for paying back the principal of the loan. (*Id.*) Sunlands' installment payment plan was very important to its success — 72.9% of Sunlands' gross billings in 2017 were received from third-party credit providers. (*Id.* ¶ 107.) The Registration Statement described numerous risks associated with Sunlands' installment payments, but said nothing about Sunlands' marketing practices. (*Id.*)

### B. At the Time of Sunlands' IPO, Deceptive and Illegal Marketing Was Pervasive at Sunlands and the Company Trained its Employees to Engage in It.

Contrary to the Registration Statement, Sunlands' marketing was not focused on the unique needs of each student.  Instead, Sunlands taught its sales force to sell courses by lying to students and by pushing them as aggressively as possible regardless of the long-term damage it might do to the Company. In early May 2018, the *Beijing News*, a Chinese publication, published the Beijing News Article on its Chinese language website. (*Id.* ¶ 40; Pl. Ex. 1 (Professionally translated version of Beijing News Article).)[2] The article described how an undercover reporter from the publication had applied for the position of "Learning Planner" at the Beijing headquarters of Sunlands in mid-March 2018 — right before Sunlands' IPO. (AC ¶ 40.)  He discovered that only a high school education was necessary for the position and the job would actually consist of being an aggressive telemarketer that used lies to get students to sign up for

---

[2] All the Chinese sources mentioned in the Amended Complaint were professionally translated by people contracted by Plaintiff's counsel.

Sunlands' STE courses. (*Id.* ¶ 41.) The reporter attended a training session for new Sunlands' sales staff on March 14, 2018 where he learned methods of deceiving student from the instructor and printed training materials. (*Id.* ¶¶ 44-48.) The strategies included posing as a teacher, which the trainer admitted was illegal. (*Id.* ¶¶ 44.) He also learned to falsely claim that examinations the students had to pass would be more difficult if they registered later, that the price of a course was discounted for only one day, and to make up false registration deadlines for courses. (*Id.* ¶¶ 44-45, 48.) Additionally, if a student was interested in an STE exam for which Sunlands did not offer a class, Sunlands' trainers instructed them to claim that Sunlands offered the class, but to then steer the students to a class that Sunlands did offer by telling students lies about the STE exam they actually wanted to take. (*Id.* ¶ 47.) The *Beijing News* also spoke with a student who a Sunlands salesperson falsely told on March 10, 2018 that if he signed up for a course, he would be able to sign up for an exam he was not eligible for and he would be exempt from English exams. (*Id.* ¶ 49.)

A Chinese speaking investigator hired by Plaintiff's counsel spoke with five confidential witnesses (referred to as "CWs") who worked in various sales positions at Sunlands at the time of its IPO in both Guangzhou and Beijing. (*Id.* ¶¶ 58, 65, 70, 72, 78.) CW1 and CW2 both stated that Sunlands held training sessions where salespeople were instructed to lie to students to get them to sign up for STE courses. (*Id.* ¶¶ 59, 66.) The CWs described some of the same deceptions as the Beijing News Article along with additional ones and the damage that those deceptions did to Sunlands' students. (*Id.* ¶¶ 58-83.) For example, CW1 explained that many of the targets of Sunlands' salespeople had weak educational backgrounds and would find STE exams very difficult. (*Id.* ¶ 63.) He said that "after the students register and finish one of the courses, they will know they are deceived." (*Id.*) He further stated that approximately 7 of 10

6

students that he signed up would regret it and want a refund. (*Id.*) An additional scheme that CW1, CW2, and CW4 discussed, which did not appear in the Beijing News Article, was promising students that taking a Sunlands course would give them "student status." (AC ¶¶ 61, 67, 72.) [3] This was not possible because STE exam students are not eligible for student status — only students who study at schools are eligible. (*Id.* ¶¶ 61 n.7.) Sunlands' salespeople, however, preyed upon the hopes and vulnerability of potential students to convince them otherwise.

The CWs also revealed misrepresentations concerning Sunlands' installment payment option and refund policy that were not in the Beijing News Article.[4] All five CWs said it was standard practice not to disclose to the students that they were taking out personal loans when they signed up for the installment payment option. (*Id.* ¶¶ 74-78.) CW2 admitted that many students would not have signed up for the option if they knew the truth. (*Id.* ¶ 75.) Although installment payment students accounted for 72.9% of Sunlands' gross billings in 2017, Sunlands failed to disclose those students did not know they were taking out loans. (*Id.* ¶ 73.)

According to CW1 and CW3, Sunlands salespeople also routinely lied to potential students about Sunlands' refund policy. (*Id.* ¶ 80-83.) Although, students were only eligible for a full refund if they asked for one within 24 hours, the salespeople would just tell the students they could get their money back if they were not satisfied. (*Id.* ¶ 81.) Sunlands made getting a refund even more difficult by putting an artificial monthly cap on them that delayed refunds even if students were entitled to them. (*Id.* ¶ 80.) CW1 reported that many students had to wait 4 to 6 months for a refund and then they would receive a smaller refund than they had been led to

---

[3] Defendants claim that the Beijing News Article contained allegations concerning student status, but that is incorrect. The Paragraph of the Amended Complaint they cite discusses the ability to sign up for STE exams, not student status. (Memorandum of Law in Support of Defendants' Motion to Dismiss ("Mot.") at 12 (citing AC ¶ 49).)

[4] The Beijing New Article did not mention installment payments at all and only made very general references to student complaints about refunds.

expect. (*Id.* ¶ 81.)  CW1 also explained that students were promised refunds if they failed an exam, but were not told of the strict conditions they had to meet to get one. (*Id.* ¶ 82.) The witness said it was a "trap." (*Id.*) CW1 further explained that students who had taken out loans to pay for a course were put in an incredibility difficult situation by long delays in refunds since they owed money to third party companies and their credit would be ruined if they stopped paying. (*Id.* ¶ 83.) On April 10, 2019, China Central Television ("CCTV") published a report consistent with the CWs account — they spoke to a student who Sunlands salespeople mislead about the length of time she had to request a refund and a student who did not receive a refund for more than six months. (*Id.* ¶¶ 84-88.) None of this was disclosed in the Registration Statement. Instead, Defendants just made the generic statement that students "may experience…negative publicity in relation to refund disputes." (*Id.* ¶ 110.)

**C. Sunlands Was Fined by its Regulator for Illegally Deceiving its Students Less Than Four Months After its IPO and Later Admitted That Use of "Softer Marketing Tactics" Led to a Dramatic Decrease in New Student Enrollment and Gross Billings.**

Article 8 of China's Anti-Unfair Competition Law ("Anti-Unfair Competition Law Article 8") "prohibits a business operator from making false or misleading publicity of product performance, function, quality, sales, user comments and prizes." (*Id.* ¶ 54.) On July 4, 2018, Sunlands' regulator, the Shijimgshan Branch of the Beijing AIC, issued an administrative penalty decision that fined Sunlands for violating Anti-Unfair Competition Law Article 8 (the "July 4, 2018 Penalty Decision"). (*Id.* ¶¶ 52-53.) The decision stated that the actions reported by The Beijing News, constituted "false and misleading commercial publicity regarding merchandise to trick and mislead consumers." (*Id.*) The Shijimgshan Branch of the Beijing AIC first served an Administrative Hearing Notice to inform Sunlands of the content of the July 4, 2018 Penalty Decision on June 14, 2018 — less than three months after the IPO. (*Id.* ¶ 55.)

On May 28, 2019, Sunlands filed a Form 6-K with the SEC that stated that, in the First

8

Quarter of 2019, Sunlands' gross billings and new student sign ups had decreased year-over-year by 28.6% and 34.2%, respectively. (*Id.* ¶ 91.) Defendant Yipeng Li, CFO of Sunlands, admitted that "softer marketing tactics" were one of the reasons for these dramatic decreases, which occurred less than a year after Sunlands' IPO. (*Id.* ¶ 92.) On August 23, 2019, Sunlands announced that its gross billings and new student enrollment numbers had again declined dramatically — 43.1% and 44%, respectively. (*Id.* ¶ 95.)

**D. There is no Indication that the Market for Sunlands ADSs was Aware of the Beijing News Article More Than a Year Before the Initial Complaint Was Filed.**

Sunlands' Registration Statement became effective on March 22, 2018 (*Id.* ¶ 1.) The Company priced its ADS as $11.50 and they started trading on the NYSE on March 23, 2018. (*Id.* ¶¶ 1-2.) On the first day of trading, the ADSs got up to a high of $14.08, but had several dips in March and April, closing as low as $7.14 on April 16, 2018 (Pl. Ex. 2 (Historical Price Record of Sunlands' ADSs).) The ADSs closed at $8.92 on April 30, 2018. The Beijing News Article was published at 2:30 PM Eastern Standard Time on the following day — May 1, 2018 (the article was published at 2:30 AM, May 2, 2018, Beijing Time, which is 12 hours ahead of Eastern Standard Time). (Defs.' Ex. B at 1; Pl. Ex. 1 at 1.) After the publication of the Beijing News Article, Sunlands' ADS price increased, closing at $9.80 on May 1, 2018, which was that day's high. (Pl. Ex. 2.) On May 2, 2018, Sunlands' ADSs dipped slightly, closing at $9.21, but that was still higher than their price on April 30, 2018.  A few days later, on May 7, 2018, Sunlands' ADSs closed at $9.98 (higher than May 1, 2018) and on May 11, 2018 they reached a high of $11.40 (ten cents less than the IPO price). (*Id.*) From May 1, 2018 through June 27, 2018 (a year before the Initial Complaint was filed), Sunlands' ADSs never closed below the price that they were on April 30, 2018 ($8.92), except for June 21, 2018 when they closed one cent lower at $8.91. (*Id.*)

On May 29, 2018, J.P. Morgan issued an analyst report concerning Sunlands (Pl. Ex. 3.) The analyst report listed the current price of Sunlands' ADSs as $9.69 and set a bullish price target of $12.50 — higher than the IPO price. (*Id.* at 1.) It did not mention the Beijing News Article or deceptive marketing tactics. Instead, in the first paragraph, it stated that "Sunlands reported its 1QFY18 results on May 21, with sales growth faster than we had expected ***mainly due to a strong marketing program***." (*Id.* (emphasis added).) Concerns about deceptive marketing tactics also did not appear anywhere in the risks listed in that analyst report. (*Id.* at 7.)

**E.  The Initial and Amended Complaint Pursue the Same Legal Theory for the Same Factual Reasons.**

Plaintiff filed his Initial Complaint on June 27, 2019, asserting claims under Sections 11 and Section 15 of the Securities Act. (ECF No. 1., "IC".) It alleged that Defendants' Registration Statement was false and misleading because:

> (1) Sunlands's student enrollment was declining; (2) Sunlands's gross billings were declining; ***(3) Sunlands's marketing tactics were not as robust as described in the Registration Statement; and (4) as a result, Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.***

(IC ¶ 29 (emphasis added).) The Initial Complaint also alleged that Sunlands admitted in its May 28, 2019 6-K that "***softer marketing tactics***" led to a steep decrease in new student enrollment and gross billings in first quarter of 2019. (*Compare* IC ¶ 30 (emphasis in IC) *with* AC ¶¶ 91-92.)

Plaintiff filed the Amended Complaint on November 15, 2019, which also asserted claims under Sections 11 and Section 15, after Plaintiff was appointed Lead Plaintiff and The Rosen Law Firm was appointed Lead Counsel. The Amended Complaint narrowed the Initial Complaint by dropping the allegations that Sunlands' student enrollment and gross billings were declining when the Registration Statement was declared effective and added additional allegations supporting the allegations that "Sunlands' marketing tactics were not as robust as

10

described in the Registration Statement." The Registration Statement portrays Sunlands as having a robust and sustainable marketing model based on "counseling-oriented interactions" and a "deep understanding" of students. Sunlands' growth was actually based on unsustainable and deceptive marketing tactics based around telling lies to potential students.

## ARGUMENT

### I.  DEFENDANTS HAVE NOT DEMONSTRATED THAT PLAINTIFF'S CLAIMS ARE UNTIMELY.

#### A.  The Amended Complaint Relates Back to the Initial Complaint.

Federal Rule of Civil Procedure 15(c)(1)(B) provides that "[a]n amendment to a pleading relates back to the date of the original pleading when…the amendment asserts a claim…that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading." "The purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." *Slayton v. Am. Exp. Co.*, 460 F.3d 215, 228 (2d Cir. 2006) (internal quotations marks omitted).  When an amended complaint "renders prior allegations more definite and precise" instead of bringing claims that are "based on an entirely distinct set of factual allegations," it will relate back. *Id.*

In *Slayton*, the Second Circuit demonstrated the permissiveness of the relation back doctrine, overturning a district court's ruling that a securities class action complaint did not relate back. *Id.* at 228-229. The Circuit held that specific allegations that the defendant failed to disclose its lack of risk management controls, lack of proper valuation methods, and the fact that its accounting was not in accordance with GAAP all related back to general allegations that the defendants did not fully comprehend the risk of its investment portfolio. *Id.* at 221-222, 228-229. The Circuit further held that the amended complaint related back for the additional reason that "the original complaint alleged that Amex misstated and/or omitted material facts in its filings

11

with the SEC in violation of SEC regulations requiring accurate representations of Amex's operations and financial conditions." *Id.* at 229. It explained that "*[a]lthough these were very general allegations*, the assertions in the amended complaint that some of these misstatements and/or omissions relate to valuation and accounting irregularities simply delineate with more detail those general allegations." *Id.* (emphasis added.)

The Initial and Amended Complaints in this case meet this standard. Defendants argue that the Amended Complaint asserts "an entirely different theory based on an entirely new set of fact allegations," but that argument appears to be based on a misunderstanding of the meaning of "robust." (Mot. at 9, 17.)  As Defendants state, the Initial Complaint proceeded under the theory "that the Registration Statement described Sunlands' marketing practices as *too* robust." (Mot. at 9 (emphasis in original).) The word "robust" means "having or exhibiting strength or vigorous health" or  "strongly formed or constructed."[5] Marketing practices based on lying to students and tricking them into making purchases they will soon regret is certainly not of "vigorous health" or "strongly formed or constructed." Instead, such tactics are unsustainable and fragile. Accordingly, the Initial and Amended Complaints pled that Defendants violated the same laws (Sections 11 and 15) for the same factual reason — that the Registration Statement described Sunlands' marketing practices as too robust. The Initial Complaint's allegation that Sunlands admitted in its May 28, 2019 6-K that the "*softer marketing tactics*" led to a significant decrease in new student enrollment and gross billings gave Defendants additional notice that the aggressiveness of Sunlands' marketing tactics would be at issue. (IC ¶ 30 (emphasis in IC).)

Defendants' citation to *ASARCO LLC v. Goodwin*, 756 F.3d 191 (2d Cir. 2014) demonstrates why their argument is wrong. (Mot. at 17.)  In *ASARCO*, 756 F.3d at 203, the

---

[5] https://www.merriam-webster.com/dictionary/robust.

complaint did not relate back because it was "based on different conduct, in a different location, and attributable to different entities." Those are the types of differences that cause an amended pleading to fail the permissive Rule 15(c)(2) standard, not what Defendants argue here.

### B. The Beijing News Article Did Not Trigger the Statute of Limitations.

Securities Act claims must be "brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. The limitations period does not start when a plaintiff is on inquiry notice, but only when "in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017). "As that determination requires a fact-intensive inquiry, 'a motion to dismiss will only be granted where ***uncontroverted evidence irrefutably demonstrates*** [that the] plaintiff discovered or should have discovered facts sufficient to adequately plead a claim.'" *Yi Xiang v. Inovalon Holdings, Inc.*, 254 F. Supp. 3d 635, 641 (S.D.N.Y. 2017) (quoting *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 763 (S.D.N.Y. 2012)).[6] A plaintiff is only charged with information from sources that "an investor of ordinary intelligence would regularly search." *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 433 (2d Cir. 2008).

The sole piece of evidence that Defendants point to from more than a year prior to the filing of the Initial Compliant (filed on June 27, 2019) is the Beijing News Article — an article published by a Chinese website and only available in Chinese. For the reasons below,

---

[6] In a footnote (Mot. at 12 n.5), Defendants argue that a Plaintiff must plead the time and circumstances of discovery of alleged omissions to plead a Section 11 claim, but that contradicts the "uncontroverted evidence" standard in *Inovalon Holdings* and *Bear Stearns*. Additionally, the Seventh Circuit has rejected that position. *See Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993) (Posner, J.) ("The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint.")

Defendants cannot "irrefutably demonstrate[]" based on that article that Plaintiff should have discovered facts sufficient to adequately plead a claim by June 27, 2018.

 1. <u>The Beijing News Article Did Not Trigger the Discovery Rule Because it was From a Chinese News Source and Only Available in Chinese.</u>

It is fundamentally unfair and contrary to the purpose of Section 11 for Defendants to direct an IPO at investors in the United States and then argue that shareholders' claims are untimely based on an article published by a Chinese news source and available only in Chinese. "The [Securities Act's] 'fundamental purpose *** was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry.'" *Feit v. Leasco Data Processing Equip. Corp.*, 332 F. Supp. 544, 563 (E.D.N.Y. 1971) (Weinstein, J.) (quoting *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963)). In line with that understanding, Sunlands' Registration Statement told investors to "**rely only on the information contained in**" it. (RS at i (emphasis in original).) Furthermore, the SEC requires that a Company listing on a stock exchange in the United States make disclosures in English. See 17 C.F.R. § 230.403 ("All Securities Act filings and submissions must be in the English language….If a registration statement or other filing requires the inclusion of a document that is in a foreign language, the filer must submit instead a fair and accurate English translation of the entire foreign language document….") Given that, the Court should not hold — certainly not on a motion to dismiss — that a Chinese news article put Plaintiff on notice of his claims.

Defendants' position that a reasonable investor would have monitored the *Beijing News* is inconsistent with the Second Circuit's analysis of what sources an investor of ordinary intelligence would regularly search. In *Staehr*, 547 F.3d at 432 (emphasis added), the Circuit stated: "*We have never affirmed the dismissal of a complaint as time-barred based on a story*

14

*that appeared only in a specialty publication*, as opposed to mainstream press reports that are more likely to come to the attention of an investor of ordinary intelligence." Defendants argue that because Plaintiff owned ADSs of a company that operates in China, he should have monitored Chinese language news sources. One could make exactly the same argument concerning specialty publications: that because an investor holds stock of a company in a particular industry, he should regularly search publications concerning that industry. The Second Circuit has, however, rejected that argument. Accordingly, the Court should not hold that Plaintiff's claim is time barred based on a single Chinese language article in the *Beijing News*.

Defendants' argument that investors can use Google Translate does not help them. (Mot. at 15.) It does not answer the question of how an investor is supposed to find the Chinese article in the first place. Do Defendants expect investors to feed all of the articles on the *Beijing News'* website (and presumably many other Chinese language new sources) into Google Translate every day? There may be an efficient way to track all significant Chinese news sources in English, but Plaintiff's counsel is not aware of one and it is not something one would expect from "an investor of ordinary intelligence." Defendants' copy of the Beijing News Article (which they translated with Google Translate) further undermines their position since it mistranslated the name Sunlands as "Suntech." (*Compare* Defs. Ex. B *with* Pl. Ex. 1.)[7]

Courts have held that Chinese language sources are not publicly available to investors in securities listed in the United States. *See In re Fuwei Films Sec. Litig.*, 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009) ("The Court finds that **the publication of three newspaper articles—in Chinese**—does not transform the information contained within the articles into 'matters of

---

[7] Defendants assert that it is "especially likely that a reasonable investor in Sunlands would have monitored the *Beijing News* in light of warnings in the English-language Registration Statement." (Mot. at 15.) Even if it were true that the Registration Statement's risk disclosure were at all informative, (which they were not, *see* Point II.B.) it does nothing to alleviate the difficulty of monitoring Chinese language publications. Furthermore, it assumes that an English-speaking investor in the United States would have even heard of the *Beijing News*.

15

general public knowledge' that may properly be imputed to Fuwei's stockholders." (emphasis added)); *In re China Mobile Games & Entm't Grp., Ltd Sec. Litig.*, No. 14-CV-4471 (KMW), 2016 WL 922711, at *9 (S.D.N.Y. Mar. 7, 2016) (holding that information was not "publicly available" because it contained "information requiring travel to China, communicating in Chinese, reading signs in Chinese, and translating financial filings in Chinese."). Defendants' argument that the Court should distinguish *Fuwei Films* based on Defendants' judgment that the newspapers in question in that case were less prominent than the *Beijing News* demonstrates the inappropriateness of resolving this issue on a motion to dismiss. (Mot. at 14 n.8.) Additionally, in *In re China Intelligent Lighting & Elecs., Inc. Sec. Litig.*, No. CV 11-2768 PSG (SSX), 2012 WL 12893520, at *7 (C.D. Cal. Feb. 16, 2012), the court held that at a Section 11 claim was not time-barred even though it was based on Chinese language company filings that the complaint pled were "publicly available" more than a year before complaint was filed.[8]

The cases that Defendants cite do not change this analysis. The only statute of limitations case they cite for the proposition that a Chinese article can trigger the statute of limitations, *Knox v. Yingli Green Energy Holding Co. Ltd.*, No. 215CV04003ODWMRWX, 2016 WL 6609210, at *7 (C.D. Cal. May 10, 2016), is easily distinguishable. There, the defendant's stock dropped 22% after "several reporters and financial analysts publicly opined" in Chinese that there was fraud in a program of defendant company. Furthermore, ***plaintiff had previously argued that those reports had an immediate effect on the defendant company's stock price in an effort to establish loss causation.*** *Id.* The court correctly concluded that "[i]f the market learned of the fraud in the Golden Sun Program by this date, so too would a reasonably diligent investor." *Id.*

---

[8] In *China Intelligent Lighting & Elecs.*, 2012 WL 12893520, at *7, the plaintiffs asserted for the first time in their opposition to a motion to dismiss that the filings were only available in Chinese and in response to a request from a lawyer licensed in China. *Id.* The Court, citing *Fuwei Films*, 634 F. Supp. 2d 419, held that it was not appropriate to decide the statute of limitations issue on a motion to dismiss. *Id.*

16

Likewise, in *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *3 (S.D.N.Y. Sept. 27, 2019), which is not a statute of limitations case, the plaintiff alleged a stock drop based on Chinese news articles. Accordingly, that court did not engage at all with the question of whether Chinese language newspaper articles are generally in the public mix of information. *See id.* at *6 (citing only to *In re SunEdison, Inc. Sec. Litig.*, 300 F. Supp. 3d 444, 488 (S.D.N.Y. 2018), which held that a *Wall Street Journal* article was in the public mix of information). As discussed in Point I.B.2., there is no evidence that the market for Sunlands' ADSs was aware of the Beijing News Article.[9]

 2. There is No Indication That the Market for Sunlands' ADSs' Was Aware of the Beijing News Article.

Even if the Court accepts Defendants' theoretical argument that investors in Sunlands' ADSs would have been aware of the Beijing News Article, it should still decline to hold that Plaintiff's claims are time-barred because there is no evidence — let alone irrefutable evidence — that the market for Sunlands' ADSs was actually aware of the Article. In securities cases, lack of movement in the stock price is strong evidence that a disclosure did not trigger the statute of limitations. *See Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 195 (2d Cir. 2003) (holding the statute of limitations was not triggered because the "stock price did not have any significant movement following the" disclosure and it remained between approximately $24.00 and $30.00 and above the price the day before the disclosure most of time for several months). Similarly, "[t]he corrective disclosure date is the same as the constructive notice date for purposes of

---

[9] Statute of limitations cases that Defendants cite to support other propositions also do not support their argument that the Beijing News Article gave Plaintiff notice. *See Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016) (notice based on articles in *The Wall Street Journal, Barron's*, and *The Financial Times*); *Pennsylvania Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 365 (S.D.N.Y. 2012) (notice given by lawsuits that were described in company filings and various news articles); *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 301 (S.D.N.Y. 2014), *aff'd,* 616 F. App'x 442 (2d Cir. 2015) (statute of limitations started to run based on disclosures by the company that its "disclosure controls and procedures were not effective due to a material weakness").

17

limitations." *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 416 (2d Cir. 2011).

In their pre-motion letter, Defendants argued that the Beijing News Article triggered the running of the statute of limitation because it was a corrective disclosure (ECF No. 29 at 2), but they have since abandoned that argument since it is impossible to argue that the Beijing News Article caused significant movement of Sunlands' ADSs. On the day that the Beijing News Article came out (2:30 AM on May 2, 2018 in Beijing, which was 2:30 PM on May 1, 2018 in New York), the ADSs rose. (Pl. Ex. 2.) The stock then moved almost back up to its IPO price on May 11, 2018. (*Id.*) From May 1, 2018 through June 27, 2018, Sunlands' ADSs never closed more than one cent below the price that they were on April 30, 2018. (*Id.*) Accordingly, there is no plausible argument that the Beijing News Article had a negative effect of the price of Sunlands' ADSs and it was not a corrective disclosure. *See Dartell v. Tibet Pharm., Inc.*, No. CV 14-3620, 2016 WL 718150, at *6 (D.N.J. Feb. 22, 2016) (holding that disclosure on a Chinese-language website was not corrective since "Defendants point to no evidence that this disclosure actually was known to the relevant public or that the market quickly priced in the disclosure").

Defendants' own motion to dismiss supports the position that an was investor of ordinary intelligence would not have been aware of the Beijing News Article prior to June 27, 2018. Defendants attached two English language sources which allude to Sunlands' deceptive marketing tactics — an earnings call (Defs. Ex. C at 6-7) and a J.P. Morgan analyst report (Defs. Ex. D at 3)[10] — but they are from ***August 24, 2018 and August 27, 2018***, respectively. Defendants fail to mention that the analyst report that J.P. Morgan issued on May 29, 2018 — the only one issued between the publication of the Beijing News Article and June 27, 2018 — did not say anything about deceptive marketing tactics even though it listed six risk factors for

---

[10] Defendants do not show that these two exhibits irrefutably triggered the statute of limitations. In both, Sunlands' management falsely assured investors that they now complied with government regulations.

18

the stock (Pl. Ex. 3 at 7.) Instead, it stated that Sunlands had faster than expected sales growth "mainly due to a strong marketing program" and set a bullish target price for the ADSs that was higher than the IPO price. (*Id.* at 1.) The fact that there is not even a hint of the Beijing News Article or its contents in J.P. Morgan's May 29, 2018 analyst report is yet another reason why Defendants' argument that Plaintiff should have monitored the Beijing News based on vague risk discloses in the Registration Statement is unreasonable.

3. Even if Plaintiff had Been Aware of the Beijing News Article, his Claims Would Not be Timed-barred Because he Could not have Shown Compensable Damages.

Even though a Section 11 plaintiff is not required to plead loss causation, the statute of limitations does not begin to run until the plaintiff can show compensable damages. *See Inovalon Holdings.,* 254 F. Supp. 3d  at 641-42 (holding that statute of limitations was not triggered by disclosure because "while Lead Plaintiff may have had some evidence that [defendant] may have made certain misrepresentations [more than a year before the complaint was filed], it likely would not have been able to show any compensable damage as a result of those misrepresentations"). Here there is no evidence, let alone incontrovertible evidence, that Plaintiff could have shown damages based on the Beijing News Article. As discussed above, Sunlands' ADSs increased in price on May 1, 2018, the day that the Beijing News Article came out. (Pl. Ex. 2.) From May 1, 2018 through June 27, 2018, the ADSs never have a closing price lower than 10 cents below their closing price on April 30, 2018. (*Id.*) Furthermore, the May 29, 2018 J.P. Morgan analyst report predicted that the ADSs' price would increase to above its IPO price. (Pl. Ex. 3 at 1.)  The Beijing News Article also did not put Plaintiff on notice of some of the most serious allegations in the Amended Complaint, including that Sunlands salespeople were selling installment payments without telling students they were taking out personal loans, that Sunlands put an artificial monthly cap on refunds, and that salespeople lied about being able to add student

19

status. *See* (Facts, Section B); *Inovalon Holdings.,* 254 F. Supp. 3d  at 641. At minimum, the Beijing News Article could not have put Plaintiffs on notice that Sunlands' statements about its installment payment plan was misleading. (AC ¶¶ 107-108, 112.) [11]

## II. THE COMPLAINT ADEQUATELY STATES A CLAIM UNDER SECTION 11 OF THE SECURITIES ACT.

On a Rule 12(b)(6) motion, the Court must "accept all factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Metz v. U.S. Life Ins. Co. in City of New York*, 662 F.3d 600, 602 (2d Cir. 2011). To survive a motion to dismiss, a complaint need only "contain sufficient factual matter…to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

Section 11 provides that any signer, director of the issuer, and underwriter may be liable if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . ." 15 U.S.C. § 77k(a). Securities Act claims are governed by Rule 8 notice pleading, *see In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 502 (S.D.N.Y. 2004), and Section 11 "impose[s] essentially strict liability for material misstatements [and omissions]," *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 148 (2d Cir. 2012). Accordingly, Section 11 places a "relatively minimal" burden on the plaintiff and even innocent misstatements are actionable. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 831-382 (1983).

### A. Plaintiff Adequately Pled Material Misrepresentations and Omissions.

Defendants very generally argue that the Registration Statement did not make any

---

[11] The statute of limitations does not begin to run until the purchase of the security, if the Court were to hold that the Beijing News Article triggered the statute of limitations, only claims of purchasers from before June 27, 2018 would be time barred.  *See Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 241 (E.D.N.Y. 2019).

material misrepresentation or omissions because companies do not have an obligation to cast their practices in a negative light. (Mot. at 22.) The Amended Complaint, however, pled three specific types of statements from the Registration Statement that are false and misleading: Statements concerning (1) Sunlands' marketing (AC ¶¶ 97, 99, 101, 103, 105); (2) the reasons for Sunlands' growth (AC ¶¶ 97[12], 114, 115, 116, 117, 118); and (3) its refund policy and installment tuition payment plan. (AC ¶¶ 107, 108, 110, 112.)

Even if a statement is literally true, it is actionable if it is misleading in context. *See Meyer v. Jinkosolar Holdings Co.,* 761 F.3d 245, 250-251 (2d Cir. 2014) ("[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth... The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context. Thus, when an offering participant makes a disclosure about a particular topic, whether voluntary or required, the representation must be complete and accurate." (internal citations and quotation marks omitted)); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) (disclosures are "measured not by literal truth," but on "whether defendants' representations, taken together and in context, would have mislead a reasonable investor").

    1.  <u>Statements Concerning Marketing (AC ¶¶ 97, 99, 101, 103, 105).</u>

As an initial matter, Sunlands' statements concerning its marketing are false and misleading because they inaccurately depict Sunlands' marketing strategy. In the Registration Statement, Sunlands repeatedly emphasized that its marketing strategy was "counseling-oriented" and based on Sunlands' "deep understanding of [students'] unique profile and

---

[12] The statement quoted in Paragraph 97 of the Amended Complaint falls in both categories one and two.

21

needs."[13] Sunlands strategy was actually to focus on signing up as many students as possible with high pressure and dishonest tactics, without regard for students needs or whether they would regret signing up. Sunlands was certainly not obligated to tout its marketing strategy throughout the Registration statement, but once it did, it was obligated to make the description "complete and accurate" and not misleading to investors. *Jinkosolar*, 761 F.3d at 251; *see also In re Lehman Bros. Sec. & Erisa Litig.*, 799 F. Supp. 2d 258, 283 (S.D.N.Y. 2011) ("A statement regarding a company's hedging strategy obliges it to disclose when it alters or suspends that strategy." (citing *Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 331 (2d Cir. 2002)).

Sunlands' statements about marketing were also misleading because, taken together, they inaccurately portrayed the risk that the Company's marketing activities posed to it. In *Jinkosolar*, 761 F.3d 245 at 251, the prospectus discussed monitoring teams for pollution abatement, that the company was subject to Chinese environmental regulations, and that non-compliance could lead to bad publicity and even the suspension of the company's business. The Second Circuit held that, taken together, these statements were misleading since the Company did not disclose that it was failing to prevent substantial violations of regulations. *Id.*

As discussed above, Sunlands made multiple comforting statements that its marketing was focused on student needs and counseling-oriented. Sunlands further stressed that its marketing staff received "extensive training."[14] Similar to *Jinkosolar*, Sunlands' Registration

---

[13] (AC ¶ 97 ("To help [students] meet their aspirations and understand the potential educational solutions, we focus our marketing and sales practices on counseling-oriented interactions and strive to deliver our courses and educational content in a highly engaging and student-friendly manner."); *Id.* ¶ 99 ("Our marketing philosophy is to promote our services to prospective students in a cost-effective manner based on our deep understanding of their unique profile and needs. We have acquired many of our existing students through effective marketing campaigns focused on showing how our services can address their specific educational needs."); *Id.* ¶ 101 (Entire section entitled "Counseling-oriented sales" that discusses providing "comprehensive counseling to prospective students."))

[14] *See* (AC ¶ 99 ("We have built a large, well-trained professional sales and marketing team."); *Id.* ¶ 101 ("We provide extensive training to our sales team to ensure they are capable of explaining our course offerings,

22

Statement stated that violating marketing regulations would damage Sunlands, making it appear that complying with such regulations was a priority for Sunlands.[15] These statements gave investors a misleading picture of Sunlands' efforts to comply with marketing regulations. At minimum, it would lead investors to expect that Sunlands was not holding training sessions where salespeople were instructed to lie to students to sell courses, in violation of Anti-Unfair Competition Law Article 8 (AC ¶¶ 52-54.) Furthermore, Sunlands' statement that it could be hurt by negative publicity "regardless of its accuracy" is misleading by itself because it gave the impression the most significant risk to investors was false allegations. (*Id.* ¶ 105.)

Defendants' contention that Sunlands' marketing statements do not make any representations, expressly or by implication, about the nature of its marketing techniques is wrong. (Mot. at 24.) Sunlands' discussion of its counseling-oriented approach and attention to student needs are prominent throughout the Registration Statement (*see, e.g.* RS at 1, 19, 77, 79, 107, 111, 116, 117, 124, 127, 128) and was clearly meant to convey to investors that Sunlands had a student centric approach to marketing that distinguished the Company. *See In re Signet Jewelers Ltd. Securities Litig.,* 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) (statements are material when they are "clearly designed to distinguish the company to the investing public in some meaningful way." (internal quotation marks omitted)). The remarkable contrast between the Registration Statement's depiction of Sunlands' marketing as focused on student needs and the actual reality that it was based on pressuring and lying to students shows the materiality of Sunlands' statements. Furthermore, Sunlands' representations were important to reassuring investors given that the Registration Statement says that Sunlands had been "exposed to negative

---

addressing questions and concerns, and recommending courses that best suit prospective students' learning objectives.").

[15] *See* (AC ¶ 103 ("If we are deemed guilty of significant infringements, we may be ordered to cease sales and marketing activities temporarily and our business license may be revoked."); *Id.* ¶ 105 (Sunlands may be "adversely affected by negative publicity…regardless of its accuracy").

publicity…alleged improper or misleading statement made in our sales and marketing activities *in the past*." (AC ¶ 105 (emphasis added));  *Signet Jewelers*, 389 F. Supp. 3d at 231.[16]

   2.   Statements Concerning Growth (AC ¶¶ 97, 114, 115, 116, 117, 118).

It is well established that if a company puts the cause of its success at issue, it is obligated to disclose information concerning the source of its success. For example, in *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342, at *6-7 (S.D.N.Y. Sept. 19, 2017), the Court held that it was misleading for the defendant company to attribute its success to an "improving macroeconomic situation, product quality and efficient sales and marketing efforts" without also disclosing that its growth was also due to paying bribes. *See also In re Van der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400–01 (S.D.N.Y. 2005) (holding that statements such as "[t]he development of our NYSE business showed once again that trading volumes and price volatility determine our opportunities to trade" required defendant to disclose that the defendant company's "revenue had been generated, at least in part, by trading practices that violated NYSE  rules"); *In re Mylan N.V. Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *6 (S.D.N.Y. Mar. 28, 2018) (attributing strength of drug's sales to "favorable pricing and volume" was misleading in the absence of additional statement that strength was also due to anticompetitive agreements and knowingly miscalculated Medicaid rebates).

Sunlands' statements give many reasons for the Company's growth, including  "a deep understanding of their students," "strong educational content development capabilities, and high-quality faculty," and "increased investment in improving the quality of our course and

---

[16] The Cases Defendants cite on this point are inapposite. In both cases the Court determined that further disclosure was unnecessary for the plaintiffs to understand the risk. *See Resnik v. Swartz*, 303 F.3d 147, 154 (2d Cir. 2002) (completely accurate description of stock option plan was not actionable because reasonable investor would understand that options have value at the time they are granted even if that value was uncertain); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010) (mandatory disclosures did not obligate defendants to make disclosures relating to the commonly understood risks associated with securities research).

educational content," [17] but failed to disclose that an important reason for its growth was deceptive marketing tactics.

Additionally, highlighting positive trends and figures is an actionable misrepresentation when they were inflated or rendered unsustainable by an undisclosed activity that is a risk to the company. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 760 (S.D.N.Y. 2017) (failure to disclose bribery scheme significantly altered the total mix of information because it called into question defendant company's "ability to secure favorable pricing in the future was durable and due to a legitimate competitive advantage, or whether-like all illegal arrangements-it was legally unenforceable and subject to abrupt termination."); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 643 F. Supp. 2d 562, 569 (S.D.N.Y. 2009) (holding that video game company violated Section 11 since "the Registration Statement contained material misrepresentations regarding the reported [user numbers] because it failed to disclose that those numbers were inflated by the inclusion of [users hired by third-party companies to play the game]").[18]

Sunlands' growth statements highlighted Sunlands' growing new student enrollments and gross billings, but failed to disclose that they were inflated and unsustainable because of

---

[17] *See* (AC ¶ 97 ("We have a large, fast-growing student base, primarily as a result of our well established brand and effective sales and marketing efforts…We believe our success is largely attributable to our deep understanding of our students.); *Id.* ¶ 114 ("We have been successful in addressing the unmet demand of a large, growing market"); *Id.* ¶ 115 ("Our success has been driven by our ability to cultivate an engaging community among students, teachers and mentors, strong educational content development capabilities, and high-quality faculty, which combined allow us to continually improve the student learning experience."); *Id.* ¶ 116 (list of factors necessary for expected growth that does not mention Sunlands' deceptive sales practices); *Id* ¶ 117 ("We are the leader in China's online post-secondary and professional education in terms of gross billings in 2017….We have a deep understanding of the educational needs of our prospective students and offer solutions that help them achieve their aspirations."); *Id* ¶ 118 ("The number of new student enrollments grew…primarily as a result of our increased investment in improving the quality of our course and educational content offerings and sales, branding and marketing spending.")

[18] Defendants try to distinguish *Giant Interactive* (Mot. at 23-24.) because there the defendant had already taken some action to decrease the number of third-party users, but the fact that Sunlands had not done anything yet to address its deceptive marketing did not make it any less material to investors. Additionally, Defendants' position rewards Sunlands for bad behavior —they are essentially arguing that if a company can get thorough its IPO before addressing a major problem, they can avoid disclosing it.

25

Sunlands' deceptive sales tactics. Sunlands itself admitted that it suffered a dramatic decline in gross billings and new student enrollments less than a year after the IPO after bad publicity and government scrutiny force it to adopt "softer marketing tactics." (AC ¶¶ 91-92.) Information about Sunlands' deceptive marketing tactics would have been material to a reasonable investor. It would have made an investor question the sustainability of Sunlands' business because of the risk of alienating students and government intervention.

3. Statements Concerning Refund Policy and "Installment Tuition Payment Plan" (AC ¶¶ 107, 108, 110, 112).

In *McMahan & Co.*, 900 F.2d at 578-581, the Second Circuit held that, although statements about a debenture holder's right to tender may have been literally true, they were misleading because an investor could have reasonably believed from the registration statement that the right to tender was a valuable right even though it was not. Sunlands' statements about its installment tuition payment plan and refund policy are misleading based on that standard. Even if those statements were literally true, they were misleading because a reasonable investor would assume that Sunlands' salespeople accurately informed potential students of those policies when selling courses. Instead, lying about the fact that installment payments were actually personal loans and telling students they would receive a refund when its refund policy was actually very restrictive was pervasive among the Company's salespeople. (AC ¶¶ 73-88.) The fact that the policies were not accurately conveyed to students does not appear anywhere in the risk factors that Sunlands listed for its installment tuition plan or refund policy. (AC ¶¶ 107; 110)

It was material to investors that Sunlands had to falsely offer more attractive terms to students to achieve its enrollment numbers than what was set forth in the Registration Statement. Misleading students about loans and refunds was also sure to alienate them and harm the company. Installment payments were very important to Sunlands because 72.9% of Sunlands

26

gross billing in 2017 were from third-party credit providers. (*Id.* ¶ 107.)

Sunlands' statements concerning its refund policy (*id.* ¶¶ 110, 112) were also false and misleading because they did not accurately portray the restrictiveness of the policy.  They did not disclose that Sunlands put an artificial monthly cap on refunds which applied no matter how many students were entitled to them, that it would frequently take 4 to 6 months to get money back, that it was almost impossible for students to get their money back because they failed their exams, and that students still have to pay their "installment payments" to third party companies while they were waiting for refunds. (*Id.* ¶¶ 79-88.) Defendants also did not disclose that Sunlands was at risk for refund requests because of its deceptive and aggressive sales tactics.

4.    The Registration Statement was False and Misleading When it Became Effective.

Contrary to Defendants' contention (Mot. 22-23), the Registration Statement was false and misleading when it became effective on March 22, 2018. The *Beijing News*' reporter attended the training on March 14, 2018 and the CWs all worked at Sunlands during the IPO. (*Id.* ¶¶ 44, 58, 65, 70, 72, 78.) Defendants argue that a company must be under investigation at the time of the IPO, but that contradicts *Jinkosolar*, 761 F.3d at 251, which held that the court could infer that problems detailed in a report submitted to Chinese regulators after the IPO "were both present and substantial at the time of the…offering." Here, the conduct that led to the July 4, 2018 Penalty Decision occurred right before the IPO.  Sunlands' deceptive marketing was also straight forwardly illegal under China's Anti-Unfair Competition Law Article 8, which was pled, (AC ¶ 54) and such conduct would be illegal almost anywhere. The Sunlands trainer also told the *Beijing News* reporter that impersonating a teacher was illegal. (*Id.* ¶ 44.)

Additionally, Sunlands statements were misleading regardless of a definitive adjudication of the legality of Sunlands' marketing practice. All *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) stands for is the unremarkable proposition that

27

there is not a free-floating obligation to disclose uncharged wrongdoing. Instead, the failure to disclose the wrongdoing must make a statement by the defendant materially misleading. *See Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 581 (S.D.N.Y. 2016) (discussing *City of Pontiac*). As explained extensively above, Sunlands' failure to disclose its deceptive marketing practices made numerous statements by Defendants misleading.

**B.  The Registration Statement's Risk Disclosures Were Inadequate.**

"A generic warning of a risk will not suffice when undisclosed facts on the ground would substantially affect a reasonable investor's calculations of probability." *Jinkosolar, Ltd.*, 761 F.3d at 251. It is well established that risk disclosures, such as the ones here, which say there is a potential for problems that would harm the Company if they were to occur, are not sufficient if the misconduct in question is already occurring. *See id.* at 250-251. ("Although this statement warned of a financial risk to the company from environmental violations, the failure to disclose then-ongoing and serious pollution violations would cause a reasonable investor to make an overly optimistic assessment of the risk."); *Van der Moolen*, 405 F.Supp.2d at 400, 415 (statements purporting to warn that a company's business "could" be negatively impacted "if" it failed to comply with industry regulations were materially misleading when the Company was violating industry regulations at the time it issued those purported warnings). Here, misconduct was pervasive at Sunlands at the time the Registration Statement became effective, including sessions where trainers taught new salespeople to sell courses by deceiving students. (*See* Facts Section B.) The five risk disclosures that Defendants discuss were all completely inadequate.

Defendants' first point to a very general paragraph in the Registration Statement that they selectively quote (Mot. at 19; RS at 31.) The statement said that "students, employees, and third-party vendors" — students are listed first — "***may***" engage in misconduct. (RS at 31 (emphasis added).) Additionally, most of the paragraph discusses fair use and intellectual property issues.

28

(*Id.*) Finally, the one sentence in the paragraph that discusses misrepresentations to students, refers to "***unauthorized*** misrepresentations" (*Id.* (emphasis added.)) Certainly, discussing unauthorized misrepresentations did not sufficiently warn investors that Sunlands was holding training sessions where their employees were instructed to lie to potential students.

The second risk disclosure (Mot. 19-20; AC ¶ 103; RS at 19-20) is the type of generic statement rejected by *Jinkosolar, Ltd.*, 761 F.3d at 251. It said, "our sales and marketing activities ***may*** be deemed to violate PRC laws" and that failing to comply with the law could harm the Company. (AC ¶ 103; RS at 19-20 (emphasis added).) This treats the misconduct as hypothetical and fails the convey the pervasive misconduct going on at Sunlands when the Registration Statement became effective. Also, as discussed above, this statement is misleading because it gave investors the impression that Sunlands understood the importance of following regulations when, in reality, misconduct was pervasive. *See Jinkosolar, Ltd.*, 761 F.3d at 251.

The third disclosure (Mot. at 20; RS at 41), which discusses uncertainties in the Chinese legal system, is irrelevant to this case. Lying to students to sell courses is not a complex legal issue and is illegal almost anywhere. Furthermore, a definitive determination of the illegality of Sunlands' misconduct is unnecessary for its Registration Statement to be misleading. Sunlands was taking a greater risk both from a legal and reputational perspective than it disclosed.

The fourth disclosure (Mot. 20-21; AC ¶ 105; RS at 20) was, itself misleading, since it makes it appear as though the greatest threat to Sunlands was negative publicity caused by false allegations. In the title of the paragraph is says that Sunlands could be harmed by negative publicity, "regardless of its accuracy." (AC ¶ 105; RS at 20.) It later discussed "false and malicious allegations" and how easy it is to disseminate "inaccurate information" on the internet. (*Id.*) Not only did this statement fail to warn of the ongoing misconduct at Sunlands, it actually

encouraged investors to dismiss negative news about Sunlands as inaccurate.

The final disclosure Defendants cite (Mot. at 21; AC ¶ 110; RS at 29-30), which says that Sunlands "may experience…refund disputes between [it] and [its] students," could apply to any consumer facing company since they all have disputes with their customers.

Collectively, these disclosures did not come anywhere close to conveying the undisclosed risk to investors from Sunlands' deceptive marketing and the fact that the Company trained its employees to engage it in. See *In re Prudential Sec. Inc. Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) (the securities laws do not protect someone who "warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.").[19]

## C. The Statements Identified by Plaintiff are Not Inactionable Puffery.

At the end of their brief, Defendants made a general argument that "many of the statements identified by Plaintiff…are nonactionable puffery." (Mot. at 24.) "Statements are not puffery if shareholders could reasonably interpret them as material misstatements." *Gross v. GFI Grp., Inc.*, 162 F. Supp. 3d 263, 268–69 (S.D.N.Y. 2016). As explained above, each statement identified by Plaintiff could be reasonably interpreted as misleading to shareholders, particularly on a motion to dismiss where all reasonable inferences must be drawn in favor of Plaintiff.

## CONCLUSION

For the reasons above, Defendants' Motion should be denied in its entirety. If the Court dismisses the Complaint, Plaintiff respectfully requests that it should be without prejudice.

---

[19] The cases Defendants cite are inapplicable. *See Qudian Inc.,* 2019 WL 4735376, at *7 (The disclosures were far stronger. The Registration Statement disclosed "that the company used a series of debt-collection methods that progressively escalated in aggressiveness" and that the company was already under investigation for "violence in loan collection processes."); *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 102 (2d Cir. 2013) (The Registration Statement actually *did* disclosed the risk. The Prospectus warned that funds could diverge from an underlying stock index if held for more than a day and shareholders tried to sue because the funds diverged); *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 185 (S.D.N.Y. 2000) (concerned complicated legal question of whether its IPO was legal in China).

Dated: May 12, 2020                    Respectfully submitted,

                                       **THE ROSEN LAW FIRM, P.A.**
                                       By: /s/Phillip Kim

                                       Laurence Rosen
                                       Phillip Kim
                                       Brian B. Alexander
                                       Jing Chen
                                       275 Madison Avenue, 40th Floor
                                       New York, NY 10016
                                       Telephone: (212) 686-1060
                                       Fax: (212) 202-3827
                                       Email: lrosen@rosenlegal.com
                                               pkim@rosenlegal.com
                                               balexaner@rosenlegal.com
                                               jchen@rosenlegal.com

                                       *Counsel for Plaintiff and the Class*

31