UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

DAVID HOROWITZ, individually and on behalf
of all others similarly situated,

                     Plaintiff,

        v.

SUNLANDS TECHNOLOGY GROUP,
TONGBO LIU, YIPENG LI, JIANHONG YIN
A/K/A PENG OU, LU LU, MICHAEL
MINHONG YU, YANG WANG, GOLDMAN
SACHS (ASIA) L.L.C., CREDIT SUISSE
SECURITES (USA) LLC, and J.P. MORGAN
SECURITIES LLC,

                    Defendants.

**MEMORANDUM AND ORDER**

19-CV-3744 (LDH)(RML)

---

LASHANN DEARCY HALL, United States District Judge:

David Horowitz ("Plaintiff"), individually and on behalf of all others similarly situated,

asserts claims under Section 11 and Section 15 of the Securities Act of 1933 (the "Securities

Act") alleging material misstatements and omissions against Sunlands Technology Group

("Sunlands"), Tongbo Liu, Yipeng Li, Jianhong Yin, Lu Lu, Michael Minhong Yu, Yang Wang

(collectively, and together with Sunlands, the "Sunlands Defendants"), Goldman Sachs (Asia)

L.L.C., Credit Suisse Securities (USA) LLC, and J.P. Morgan Securities LLC (collectively, the

"Underwriter Defendants," and together with the Sunlands Defendants, the "Defendants").

Defendants move, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, for judgment

on the pleadings.

**BACKGROUND**[1]

Sunlands is a Chinese company that provides online post-secondary and professional education services in China, including self-taught higher education examination ("STE") programs. (Am. Compl. ¶¶ 3, 19, 37, ECF No. 25.) The STE system was initiated by the Chinese government in the early 1980s as an alternative to the formal higher education provided at colleges and universities. (*Id.* ¶ 37.) The STE system contains two components: (i) the self-taught program, consisting of courses within a specific study area provided by education-service institutions, such as Sunlands, and (ii) national examinations administered by the Chinese government. (*Id.*) In 2017, STE courses accounted for 89.2% of Sunlands's gross billings and 80.1% of its new student sign-ups. (*Id.*)

In March 2018, Sunlands conducted its initial public offering ("IPO") of American Depositary Shares ("ADSs") in the United States, pricing its offering at $11.50 per ADS and listing the ADSs on the New York Stock Exchange. (*Id.* ¶¶ 19, 36.) Through the IPO, Sunlands issued and sold approximately 13 million ADSs, worth approximately $150 million. (*Id.* ¶ 36.) Sunlands's ADSs now trade on the New York Stock Exchange. (*Id.* ¶ 19.) The Underwriter Defendants served as underwriters for the IPO. (*Id.* ¶¶ 30-32, 33(a).) In this capacity, the Underwriter Defendants assisted Sunlands and its officers and directors in planning the IPO, including conducting a due diligence investigation. (*Id.* ¶ 33(c).)

In connection with the IPO, Sunlands filed with the U.S. Securities and Exchange Commission ("SEC") a Form F-1 registration statement and prospectus (and subsequent amendments thereto), which were effective as of March 22, 2018 (collectively, the "Registration Statement"). (*Id.* ¶¶ 35, 36.) The Registration Statement contained disclosures concerning

---

[1] The facts—taken from the pleadings, as well as documents incorporated therein and attached thereto—are assumed to be true for purposes of this Memorandum and Order.

Sunlands's business, including potential risks it faced as of the date of the IPO. Among other things, the Registration Statement disclosed the risks of negative publicity and potential government investigation or enforcement activity with respect to Sunlands's sales and marketing practices. (Edmund Polubinski III Decl. ("Polubinski Decl."), ECF No. 54-2; Ex. E (Registration Statement) at 19–20, ECF No. 54-7.[2]) Specifically, the Registration Statement warned investors that the company's "sales and marketing activities may be deemed to violate [China's] laws and regulations, and [the company] may be exposed to administrative penalties, such as paying fines or publishing explanatory notes to limit the adverse effects of [Sunlands's] marketing efforts." (Polubinski Decl. Ex. E at 19–20.) Sunlands further disclosed that it has "been exposed to negative publicity concerning refund dispute[s] and administrative penalt[ies] and alleged improper or misleading statement[s] made in [the company's] sales and marketing activities in the past." (Id. at 20.) The Registration Statement continued that Sunlands may be adversely affected by any negative publicity concerning, inter alia, "alleged misconduct or other improper activities committed by [Sunlands's] students or [] directors, officers, and teachers and other employees, including misrepresentation[s] made by [Sunlands's] employees to potential students during sales and marketing activities[.]" (Id. at 20.) It went on to say that "[f]raud or other misconducts [sic] by" Sunlands's employees "may also involve engaging in unauthorized misrepresentation to [Sunlands's] potential students . . . during marketing activities," and could, among other things, "result in customer complaints, regulatory and legal liabilities, as well as serious harm to [Sunlands's] brand and reputation." (Id. at 31.)

On May 2, 2018, The Beijing News, a news outlet owned by the Chinese government, published an article on its website that exposed information regarding Sunlands's sales and

---

[2] The Registration Statement is incorporated by reference into the Amended Complaint. (See Am. Compl. ¶¶ 96–119.)

marketing practices (the "Beijing News Article").  (*See* Am. Compl. ¶¶ 6–9; Sunlands's Answer ("Answer"), Ex. A (English translation of The Beijing News Article), ECF No. 46-1.) Specifically, the 10-page article provided the account of a purported "undercover reporter" who applied for and was hired to perform a sales role at Sunlands.  (Am. Compl. ¶ 6; *see also* Answer, Ex. A.)  The undercover reporter claimed that Sunlands employees were trained to use a variety of "techniques . . . to trick students into buying courses using misrepresentations." (Answer, Ex. A; *see also* Am. Compl. ¶¶ 7, 40–49.)  These techniques included: (i) "[u]sing various fake teacher identities to gain the trust of students even though none of the salespeople were actually teachers"; (ii) "[m]aking up false registration deadlines for courses"; (iii) "[f]alsely claiming that the examinations students had to pass would be more difficult if the students registered later"; (iv) "[f]alsely claiming the price of the course was discounted for only one day"; and (v) "[f]alsely telling students who wanted to study subjects for which Sunlands did not offer a course that Sunlands did offer the course, but that it was too difficult for that student.  The salesperson would then steer the student to Sunlands courses in different areas by portraying those exams as easy."  (Am. Compl. ¶ 7.)

On July 4, 2018, the Shijingshan Branch of the Beijing Administration for Industry and Commerce issued an administrative penalty decision (the "2018 AIC Decision") against Sunlands.  (Answer, Ex. B, ECF No. 46-2; Am. Compl. ¶¶ 10, 52–55.)  The 2018 AIC Decision charged Sunlands with using "false and misleading terms" to "deceive and mislead consumers," including by citing false registration deadlines and supposedly adverse implications for failing to register.  (Answer, Ex. B at 1.)  According to the Decision, "[t]his behavior was secretly visited by reporters of [T]he Beijing News and reported publicly through newspapers and the Internet." (*Id.*; Am. Compl. ¶ 52.)

Subsequently, on August 24, 2018, Sunlands conducted a public earnings call for the second quarter of 2018 (the "August 2018 Earnings Call").  (*See* Answer, Ex. C (English translation of August 2018 Earnings Call), ECF No. 46-3.)  An English translation of the transcript of the call was posted on Sunlands's English-language website.  (Polubinski Decl. ¶ 4.)  The transcript reflects that, during the question-and-answer session of the August 2018 Earnings Call, a Credit Suisse analyst asked about negative publicity and any "government reactions." (Answer, Ex. C at 6.)  Sunlands responded that after the "negative publicity that occurred in May" Sunlands "started to take . . . new initiatives in order to provide better user experience to [its] students, like free trial classes, like a live assertive sales approach to students."  (*Id.* at 7.) As a follow up, the analyst asked about the "government responses to Sunlands's reactions and new initiatives" and if the government was "still checking the malpractices of some sales team" or were "already satisfied with the current regulation."  (*Id.*)  Sunlands maintained that it was in "100% compliance with government regulations" and there were no "other government regulation violations."  (*Id.*)

Three days later, on August 27, 2018, J.P. Morgan issued an analyst report recounting "[h]ighlights from [an] analyst briefing," which presumably referred to the August 2018 Earnings Call (the "August 2018 JPM Report").  (Answer, Ex. D, ECF No. 46-4 at 3.)  Therein, J.P. Morgan referred to "negative publicity regarding the high proportion of students using loans to finance tutorial classes and the company's restrictive returns policy."  (*Id.* at 1.)  The report then stated that "[m]anagement mentioned that after the negative news in May, the company launched many initiatives to address the problems and now is compliant with government regulation."  (*Id.* at 3.)  Ultimately, the report gave Sunlands an "Overweight" rating, indicating

that it expected Sunlands's stock to perform well in the coming six to twelve months.  (*Id.* at 1, 11.)

On November 27, 2018, Credit Suisse issued an analyst report on Sunlands.  (Am. Compl. ¶ 89.)  The report discussed the 2018 AIC Decision and stated that Sunlands was "fined by the Beijing government for aggressive sales practices that misled students and aroused negative media publicity."  (*Id.*)  According to the Credit Suisse report, that negative publicity "caused Sunlands to make significant changes to its operating process to prohibit misleading statements and excessive harassment."  (*Id.*)  On February 15, 2019, Credit Suisse issued another analyst report, stating that "the company [was] still facing significant slowdown" as a result of the 2018 AIC Decision.  (*Id.* ¶ 90.)

On June 27, 2019, Plaintiff filed the initial complaint in the instant action.  (Compl., ECF No. 1.)  On November 15, 2019, Plaintiff filed the Amended Complaint alleging that "the registration statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein."  (*See* Am. Compl. ¶ 128.)  Defendants moved to dismiss the Amended Complaint on June 11, 2020.  (*See* Motion to Dismiss, ECF No. 35.)  By Memorandum and Order dated March 31, 2021, Judge Frederic Block denied that motion.  (*See* Mem. & Order, ECF No. 41.)  The next day, the action was transferred to this Court.  The Defendants filed their answers to the Amended Complaint on May 17, 2021.  (*See* Underwriters' Answer, ECF No. 44; Sunlands's Answer ("Answer"), ECF No. 46.)

## STANDARD OF REVIEW

A motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) is reviewed under the same standard as a motion to dismiss under Rule 12(b)(6).  *See Bank*

*of N.Y. v. First Millennium*, 607 F.3d 905, 922 (2d Cir. 2010) (citing *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir. 1994)) ("The same standard applicable to Fed. R. Civ. P. 12(b)(6) motions to dismiss applies to Fed. R. Civ. P. 12(c) motions for judgment on the pleadings.").  As with a motion made pursuant to Rule 12(b)(6), to withstand a Rule 12(c) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id*.  While this standard requires more than a "sheer possibility" of a defendant's liability, *id*., "[i]t is not the Court's function to weigh the evidence that might be presented at trial[,]" *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999).  Instead, "the Court must merely determine whether the complaint itself is legally sufficient[,]" and "in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id*. (citations omitted).  In deciding a motion for judgment on the pleadings, the court also considers "the defendants' answer, any written documents attached to the complaint or the answer, any document that is incorporated by reference into the complaint, any document that is 'integral' to the complaint, and any matter of which the court may take judicial notice."  *Velarde v. GW GJ, Inc.*, 914 F.3d 779, 781, n.1 (2d Cir. 2019) (citation omitted).

## DISCUSSION

Defendants move for judgment on the pleadings, arguing that Plaintiff's claims are barred by the one-year statute of limitations that governs claims brought under Sections 11 and 15 of the Securities Act.  This is not the first time Defendants have raised this argument.  Indeed, Defendants previously moved to dismiss the amended complaint on the same basis.  Judge Block

denied that motion, holding that the court could not determine as a matter of law whether the instant action was timely filed. (Mem & Order at 5.)

In response to Defendants' instant motion, Plaintiff contends that because Defendants raise the same arguments on essentially the same record as they did before Judge Block, Defendants are, in effect, requesting reconsideration of Judge Block's decision on the motion to dismiss, which constitutes the law of the case. (Pl.'s Opp'n at 12–14, ECF No. 55.) As such, Plaintiff argues that Defendants' motion should fail because Defendants have not satisfied the standard for a motion for reconsideration or the similar standard necessary to overcome the law of the case doctrine. (*Id.* at 13–15.)

Defendants respond that Judge Block's decision is not binding on this Court for three reasons. *First*, Defendants contend that the record on the instant motion is different from the record that was before Judge Block because, in addition to the exhibits attached to the answer, Defendants attach to their reply brief "a copy of a version of the Beijing News Article posted to the website of Xinhua News, China's state-sponsored news agency," all of which were not before the court on the motion to dismiss. (Defs.' Reply Mem., ECF No. 56 at 10.) *Second*, Defendants argue that they "'are permitted by Rule 12(h)(2) to bring successive motions challenging the sufficiency of a claim, the first under 12(b)(6) and the second, after the Answer has been filed, under Rule 12(c).'" (Defs.' Mem., ECF No. 54-1 at 18.) *Third*, Defendants argue that whether the Court should treat the instant motion as one for reconsideration or find that it is subject to the law of the case doctrine is beside the point, because, under any standard, Judge Block's Memorandum and Order was clearly erroneous. (*Id.* at 19–21.) On this final point, Defendants are not altogether wrong. That is, regardless of the standard applied, there is but one conclusion. Judge Block did not err, and Defendants' motion should be denied.

## I.     Statute of Limitations

Plaintiff filed the amended complaint on November 15, 2019.[3]  Defendants maintain that the amended complaint is barred by the statute of limitations.  Because the statute of limitations is an affirmative defense, Defendants carry the burden of showing that Plaintiff failed to plead timely claims.  *See Staehr v. Hartford Fin. Servs. Grp.*, 547 F.3d 406, 425 (2d Cir. 2008) ("The lapse of a limitations period is an affirmative defense that a defendant must plead and prove.").  Defendants have not met their burden.

An action asserting claims for misrepresentations under Sections 11 and 15 must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence."  15 U.S.C. § 77m; *see also Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 349 (2d Cir. 1993) (claims under Sections 11 and 15 of the '33 Securities Act are governed by the statute of limitations contained in 15 U.S.C. § 77m).  "A securities-law violation is discovered when the plaintiff learns sufficient information about the violation to plead it in a complaint with enough detail and particularity to survive a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss."  *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 119 (2d Cir. 2017) (quotations and alterations omitted) (citing *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 175 (2d Cir. 2011)).  "A plaintiff is charged with knowledge of any fact that 'a reasonably diligent plaintiff would have discovered.'"  *Nomura*, 873 F.3d at 119 (2d Cir. 2017) (citing *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 653 (2010)).)  Accordingly, "the limitations period commences . . . when [] a reasonable investor conducting such a timely

---

[3] Defendants maintain, and Plaintiff disputes, that the amended complaint does not relate back to Plaintiff's original complaint filed June 27, 2019.  For purposes of this Memorandum and Order, the Court assumes, without deciding, that the Amended Complaint does not relate back to the June 27, 2019 complaint.

investigation would have uncovered the facts constituting a violation." *City of Pontiac*, 637 F.3d at 174; *see also Merck*, 559 U.S. at 651–53 (same).[4]

## A. Discovery of The Beijing News Article and 2018 AIC Decision

According to Defendants, Plaintiff's claim should have been discovered after The Beijing News Article was published on May 2, 2018.[5]  (Defs.' Mem. at 11–13.)  Certainly, as Defendants argue, media coverage can, under certain circumstances, constitute sufficient notice of a potential securities claim.  Indeed, media coverage is one of a number of factors courts look to in determining whether information was reasonably discoverable for the purpose of a statute of limitations defense.  Courts also look to indicators such as (i) a significant decrease in the stock price resulting from discovery of the article (evidencing that the market learned of it),[6] (ii) the publication of the facts giving rise to a plaintiff's claim in major "mainstream" news publications in the United States,[7] (iii) public disclosures filed with the SEC by the defendant company itself,[8]

---

[4] Although *Merck & Co. v. Reynolds*, 559 U.S. 633 (2010) addressed the statute of limitations under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), the weight of authority in this circuit has applied *Merck* to alleged violations of Section 11 and Section 15 of the Securities Act of 1933, 15 U.S.C. § 77m.  *See Yi Xiang v. Inovalon Holdings, Inc.*, 268 F .Supp. 3d 515, 519–22 (S.D.N.Y. 2017) (collecting cases).

[5] There is no real dispute that the content of The Beijing News Article is sufficient to provide Plaintiffs with the information needed to plead a securities violation.  It is.  Indeed, Plaintiffs appear to concede this point.  (Pl.'s Opp'n at 13-20.)  The same is true with respect to the 2018 AIC Decision.

[6] *See, e.g.*, *Monroe Cnty. Emps.' Ret. Sys. v. YPF Sociedad Anonima*, 15 F. Supp. 3d 336, 351-52 (S.D.N.Y. 2014) (plaintiffs pleaded that stock decline of over 10% and 14% resulted from the publication of certain news articles); *but see DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 440 (S.D.N.Y. 2018) ("While a 'sharp decline' in the value of securities over a short period of time may be a factor giving rise to inquiry notice, Defendants cite to no authority holding that such a decline is also enough under *Merck* to inform a reasonably diligent investor of a securities-law violation." (internal citation omitted)).

[7] *See, e.g.*, *NECA–IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x 79, 81 (2d Cir.2015), *cert. denied*, 577 U.S. 821 (2016) (sufficient information to plead the claims was in the public domain by virtue of, inter alia, widespread press coverage in national publications such as The New York Times and The Wall Street Journal); *Monroe*, 15 F. Supp. 3d at 352 & n.106 (widespread national coverage in Bloomberg News, the Financial Times, and the Wall Street Journal triggered the statute of limitations); *Youngers v. Virtus Inv. Partners Inc.*, 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016) (statute of limitations triggered by news reports published in The Wall Street Journal, Barron's, and The Financial Times, that straightforwardly reported that the SEC was investigating the exact allegations contained in the complaint)).

[8] *See, e.g.*, *Emerson v. Mut. Fund Series Tr.*, 393 F. Supp. 3d 220, 240–41 (E.D.N.Y. 2019) (holding that the limitations period for each plaintiff began to run at the date they purchased their securities, at the earliest, or at the

or (iv) some other evidence that the information was, in fact, discoverable by a reasonably diligent investor more than one year before the filing of the complaint.[9]

In this case, Defendants argue principally that The Beijing News is analogous to major national "mainstream media" publications in the United States.  (Defs.' Mem. at 14.)  Defendants press that, because The Beijing News is a state-sponsored newspaper in China's capital, an article published there is exactly the type of "mainstream media" that the Second Circuit has held an investor would uncover, thereby triggering the statute of limitations.  (Defs.' Reply at 5.)  But, the cases Defendants rely upon for this proposition are inapposite.

In *Monroe County Employees' Retirement System v. YPF Sociedad Anonima*, the plaintiffs—investors in an Argentinian company trading on the NYSE—alleged that the company's registration statement was materially misleading in violation of Sections 11 and 12 of the Securities Act because they failed to disclose defendant's "inadequate investment in domestic exploration and the resulting heightened risk of nationalization by the Argentinian government." 15 F. Supp. 3d 336, 351 (S.D.N.Y. 2014).  There, the information allegedly omitted from the registration statement was widely discussed in major media reports by U.S. publications, such as Bloomberg News, the Financial Times, and The Wall Street Journal, well over a year before the action was commenced.[10]  *Id.* at 351–52 & n.106.  The court dismissed the plaintiffs' claims as

---

date of first publishing of the Fund's quarterly holdings after the initial purchase, where quarterly prospectuses revealed the basis of plaintiffs' claims); *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, 68 F. Supp. 3d 530, 537 (S.D.N.Y. 2014) (holding that a "stark pattern of defaults that would have been obvious by early 2011 through the most cursory examination of public filings").

[9] *See, e.g.*, *Gavin*, 68 F. Supp. 3d at 537 (declaration by investor, from over a year before the complaint was filed, made clear that investors were in fact already aware that misrepresentations had been made to them).

[10] Moreover, the plaintiffs also pleaded that the company's stock prices fell in response to specific articles.  For example, the plaintiffs pleaded that in response to an article regarding government officials' discussion of a government takeover of the company, the company's stock price fell by more than 10 percent.  *Monroe*, 15 F. Supp.3d at 351.  The plaintiffs further pleaded that after company executives met with a government official, speculation regarding a government takeover resulted in the company's ADSs declining by over 14 percent.  *Id.* at 351–52.

time-barred, finding that, "[i]n light of the widespread national coverage of the risk of nationalization and [the company's] alleged underinvestment, plaintiffs should have discovered the alleged omissions in the [r]egistration [s]tatement long before April 16, 2012." *Id.* at 352. Similarly, in *Youngers v. Virtus Investment Partners Inc.*, the court found that the statute of limitations was triggered by news reports published in The Wall Street Journal, Barron's, and The Financial Times, each of which straightforwardly reported that the SEC was investigating the exact allegations contained in the complaint. 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016).

As Plaintiff points out, in making their respective determinations, the courts in *Monroe* and *Youngers* relied on articles published in major national, English-language publications, such as The Wall Street Journal, Bloomberg, and The Financial Times.[11] (Pl.'s Opp'n. at 19, n.7 (citing *Youngers*, 195 F. Supp. 3d at 521, then citing *Monroe*, 15 F. Supp. 3d at 352 & n.106).) In other words, these cases do not provide a basis for finding that information reported in an article published exclusively in another country and in another language is sufficient to put a U.S.-based investor on notice of a securities violation. Indeed, Defendants' case law supports only the proposition that a reasonably diligent investor should be deemed, as a matter of law, to have discovered a securities-law claim where the basis for that claim is widely reported in U.S. mainstream media publications.[12] *See NECA–IBEW Pension Tr. Fund v. Lewis*, 607 F. App'x

---

[11] Although not authoritative, it is worth noting that in 2021, the Pew Research Center conducted a survey regarding the general understanding of what constitutes "mainstream media". *See* SHEARER, ELISA AND MITCHELL, AMY, *Broad agreement in U.S. – even among partisans – on which news outlets are part of the 'mainstream media'*, PEW RESEARCH CENTER (May 7, 2021), https://www.pewresearch.org/fact-tank/2021/05/07/broad-agreement-in-u-s-even-among-partisans-on-which-news-outlets-are-part-of-the-mainstream-media/. While survey responses were limited to certain media outlets, the results show that respondents—a representative sample of U.S. adults—consider publications such as The New York Times and The Wall Street Journal to constitute "mainstream media." *Id.*

[12] *Freidus v. Barclays Bank PLC*, also cited by Defendants, is similarly unhelpful. 734 F.3d 132 (2d Cir. 2013). There, the Second Circuit affirmed the dismissal of certain claims as time barred where a company's publicly filed corrective disclosures, which were filed more than a year before the complaint, provided precisely the information defendant should have disclosed earlier, such that the plaintiffs "should have discovered their alleged claims on the dates of those disclosures." *Freidus*, 734 F.3d at 138. The Beijing News Article, which was published only in Chinese in a Beijing-based news outlet, is not comparable to a company's financial disclosures publicly filed with

79, 81 (2d Cir.2015), *cert. denied*, 577 U.S. 821 (2016) (affirming denial of leave to amend Section 11, 12, and 15 claims where "a reasonably diligent plaintiff would have had sufficient information [to plead his claims]" because such information "was in the public domain by virtue of . . . numerous federal and state lawsuits . . . and [] widespread press coverage . . . in national publications such as *The New York Times* and *The Wall Street Journal*").  Tellingly, Defendants have not pointed to a single case where a court has held that an article published in another country—whether in that country's mainstream media or not—is alone sufficient to establish that a reasonably diligent investor should have discovered a securities violation.  And the Court is not otherwise persuaded that it is.

The Court is persuaded, however, by Plaintiff's argument that The Beijing News Article is akin to an article appearing in a "specialty publication," such as those at issue in *Staehr v. Hartford Financial Services Group, Inc.*  In *Staehr*, the Second Circuit declined to find specialty publications sufficient to put investors on notice of a securities violation claim.  *See* 547 F.3d 406, 432 (2d Cir. 2008).  There, the court stated: "We have never affirmed the dismissal of a complaint as time-barred based on a story that appeared only in a specialty publication, as opposed to mainstream press reports that are more likely to come to the attention of an investor of ordinary intelligence."  *Id.*  The *Staehr* court went on to express its reluctance to affirm a dismissal on statute of limitations grounds based on an article in a specialty publication where the coverage of the alleged fraud was relatively minimal, and the court did not know "the publications' circulations or the extent to which a reasonable investor would be aware of the limited coverage."  *Id.*

---

the SEC.  While "courts routinely find the information contained in annual and quarterly reports filed with the SEC within the purview of what a reasonable investor would consider," *Emerson*, 393 F. Supp. 3d at 247, Defendants have not provided any indication that the same can be said for news articles published only in outlets like the Beijing News.

Here, although The Beijing News Article's coverage of the alleged fraud was extensive and company-specific—unlike the article at issue in *Staehr*—this Court, too, is reluctant to dismiss on statute of limitations grounds based on a story that appeared only in a foreign publication. This is particularly so where Defendants have not pointed to anything to support their characterization of The Beijing News as a "mainstream media" publication akin to The Wall Street Journal, Bloomberg, or any other major publication covering stocks that trade on the NYSE. Defendants have not provided any information regarding The Beijing News's circulation. They have not provided any information regarding when a reasonably diligent investor would have been alerted to The Beijing News article. And they have not provided any information regarding how a reasonably diligent investor would, or even could, have accessed the Article prior to November 15, 2018.[13] At bottom, Defendants have failed to demonstrate the extent to which a reasonable investor would be aware of the Article.

Defendants argue that the fact that The Beijing News Article was published in Chinese in a China-based publication was no obstacle to its discovery because a reasonably diligent investor would have set up Google Alerts for any Chinese-language news about the company, or at least performed regular Google Searches, using the company's name in Chinese Characters. (Defs.' Mem. at 14.) In support of this argument, Defendants rely on *Knox v. Yingli Green Energy*, a district court case out of the Central District of California. (Defs.' Mem. at 14–15.)

In *Knox*, the court found, on a motion to dismiss, that the plaintiffs' security law violation claims were time barred. No. 15-cv-04003, 2016 WL 6609210, at *7 (C.D. Cal. May 10, 2016).

---

[13] Perhaps acknowledging that the *Beijing News* may not be as "mainstream" as Defendants suggest, they attach to their reply brief a Google Translate version of The Beijing News Article that was re-published online by Xinhua News, the official state-run press agency of China and China's largest news publication. (Defs.' Reply, Ex. G, ECF No. 2.) Perhaps this may be considered mainstream media in China, but Defendants have not shown that Xinhua News is considered mainstream media in the United States nor have they shown that this version of the article would have been discovered by a reasonably diligent U.S.-based investor prior to November 15, 2018.

There, the court considered multiple public statements as well as articles published in Chinese and English—including an article published by Bloomberg News and several English-language articles published in an industry journal—which were followed shortly thereafter by a cumulative 22% drop in the company's stock price over the course of five days.  *Id.* at \*2, \*7; *see also* Consolidated Class Action Complaint ¶¶ 146–151, *Knox v. Yingli Green Energy Holding Company Limited*, No. 15-cv-04003 (C.D. Cal. Jan. 4, 2016), ECF No. 74.  The court reasoned that if the market learned of the fraud by March 25, 2013—the date that the stock price drop reached 22%—"so too would a reasonably diligent investor."  *Knox*, 2016 WL 6609210, at \*7.  The plaintiffs' security-law violation claims, filed in May 2015, were therefore untimely under the applicable two-year statute of limitations.  *Id.*  The *Knox* court rejected the plaintiffs' argument that because key reports were written in Chinese, they were not reasonably discoverable before May 2013.  *Id.*  Specifically, the court found that the fact that the articles were published in Chinese did not justify any significant delay in discovery, because "[i]n this day [and] age, reasonably sophisticated analysts and investors following a China-based company should have the means with which to locate and analyze Chinese-language news articles just as quickly as it could with English-language news articles."  *Id.*

The Court agrees that a reasonably sophisticated analyst or investor would have such means.[14]  The Court cannot, however, square the "reasonably sophisticated analyst or investor" standard applied in *Knox* with the "reasonably diligent investor" standard the Court must apply here.[15]  In any event, the court in *Knox* did not merely find that a single Chinese-language news

---

[14] A reasonably sophisticated investor may, for example, include professional analysts, such as the author(s) of the August 2018 JPM Report or authors of other such reports to which a reasonably diligent investor may be expected to subscribe.

[15] Compare *Investor*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining a "sophisticated investor" as "[a]n investor who has sufficient knowledge and experience of financial matters to be capable of evaluating a security's qualities. . . .  Sophisticated investors do not require the full protection of securities laws."), with *Diligent*, BLACK'S

article was a sufficient basis for the plaintiffs to discover their securities law claim.  Rather, the court found that the mere fact that some articles were written in Chinese was insufficient to justify a delay in discovery where other English language articles, and a resulting multi-day drop in the company's stock price, would have led a reasonably diligent investor to discover the facts giving rise to a claim for fraud.  Facts similar to those that supported such a conclusion in *Knox*, however, are not present here.  For example, in *Knox*, the court looked to multiple articles, several of which were written in English, and at least one of which was published in a U.S.-based "mainstream media" publication—Bloomberg News.  (*Knox* Compl. ¶¶ 147–150.)  The court did not rely, as Defendants urge the Court to do here, solely on an article published exclusively in Chinese by a Chinese publication.[16]  Additionally, the plaintiffs in *Knox* pleaded that the March 2013 news reports had an immediate effect on the market price, effectively conceding that the articles were reasonably discoverable on that date, as evidenced by the multi-day drop in market price.  *Knox*, 2016 WL 6609210, at *7.  Plaintiffs make no such concession here.  Moreover, the Court cannot conclude, based on a mere 6% dip in the closing price of Sunlands's ADSs on May

---

LAW DICTIONARY (11th ed. 2019) (defining "diligent" as "[c]areful, attentive, and hardworking; persistent in doing something; industrious; assiduous" or "[c]arried out with care and steady effort.").

[16] Courts considering foreign news articles or websites in other contexts have reached differing conclusions.  In considering whether a company was relieved of its duty to disclose information to shareholders where the information had become a "matter of general public knowledge," the court in *In re Fuwei Films Securities Litigation* held that the publication of three Chinese newspaper articles did not "transform the information contained within the articles into 'matters of general public knowledge' that may be properly imputed to [the company's] stockholders." 634 F. Supp. 2d 419, 438 (S.D.N.Y. 2009).  By contrast, another court in the Southern District of New York held that an alleged misstatement could not qualify as material where the relevant facts were "already in the mix of public information" at the time of the IPO, as evidenced by three Chinese news articles similar to The Beijing News Article.  *In re Qudian Inc. Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 WL 4735376, at *6 (S.D.N.Y. Sept. 27, 2019).  But in a more recent case out of the Central District of California, a court rejected a similar argument that documents written in Albanian and located on an Albanian government website were available to a reasonable investor (or could have been reviewed by a reasonable investor using Google translate).  *Longo v. OSI Sys., Inc.*, No. CV 17-8841, 2021 WL 1232678, at *7 (C.D. Cal. Mar. 31, 2021).  There, the court found that "it is plainly unreasonable to require an investor to comb foreign websites in languages such as Arabic, Chinese, Russian, etc., to determine whether the company in which he or she has invested has disclosed information that may be material to his or her investment." *Id.*

2, 2018, that the market had learned of The Beijing News Article.  This is particularly so in light of the fact that for approximately two months thereafter, Sunlands's ADSs never closed more than one cent below the price that they were on April 30, 2018 ($8.92.), the day before The Beijing News Article was published.[17]  *Cf. Newman v. Warnaco Grp., Inc.*, 335 F.3d 187, 195 (2d Cir. 2003) (statute of limitations was not triggered where the "stock price did not have any significant movement following the" disclosure and remained roughly between $24.00 and $30.00 and above the price the day before the disclosure for several months).  Thus, as Plaintiff argues, *Knox* is distinguishable from the instant action.

That The Beijing News Article appears in Google searches conducted well after November 15, 2018, or that Plaintiff was ultimately able to discover it, are not dispositive to the question of whether The Beijing News Article was reasonably discoverable prior to November 15, 2018.  Although Defendants submit that a search of the company's name, in Chinese characters, returned The Beijing News Article in the first page of Google results (Defs.' Reply Mem. at 7, n.8; Edmund Polubinski III Reply Decl., Ex. H, ECF No. 56-3), that search was conducted in June 2020 and Defendants have provided no information as to whether it was accessible earlier.[18]

As to the 2018 AIC decision, Defendants do not argue that a reasonably diligent investor would have discovered it.  And, as Plaintiff points out, Defendants offer no explanation as to

---

[17] According to Plaintiff, The Beijing News Article was published on May 1, 2018, at 2:00 p.m. EST, which was 2:30 a.m. on May 2, 2018, Beijing Time, 12 hours ahead of EST.  (Pl.'s Opp'n at 7.)  Thus, April 30, 2018, was the day before The Beijing News Article was published.

[18] The Court notes that, as of March 18, 2022, China is not an available region in Google's search settings and searching Sunlands's name in Chinese characters does not return The Beijing News Article in the first six pages of results.  Moreover, although Defendants argue that a Plaintiff could have copied the Chinese characters for Sunlands's name from the Registration Statements and pasted them into Google, the Court also notes that the Chinese characters in the Registration Statement are not copiable text.  Information regarding the Defendants' search settings would be particularly useful information for them to provide, but they did not.

how a non-Chinese speaking, U.S.-based investor could have found the 2018 AIC Decision, which was "issued in Chinese by a Chinese regulatory agency." (Pl.'s Opp'n at 22.) Indeed, Defendants do not argue, or demonstrate, that the decision was publicly available or otherwise readily accessible at any time, much less prior to November 15, 2018. *Cf. Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 942 (C.D. Cal. 2012) (rejecting "public knowledge" defense to disclosure requirements, where there was no evidence to suggest that negative facts were already publicly known, as evidenced, for example, by the fact that defendant's SAIC filings were not public, and even if they were, they were not readily accessible for U.S. investors).

The Court cannot find, as a matter of law, that a reasonably diligent investor would have discovered The Beijing News Article or the 2018 AIC Decision prior to November 15, 2018.

## B.  Inquiry Notice

Defendants next argue that, at the very least, Plaintiff should have discovered The Beijing News Article prior to November 15, 2018. (Defs.' Mem. at 15–18.) This, they maintain, is because certain English-language sources—namely, Sunlands's March 22, 2018 Registration Statement, a transcript of the August 2018 Sunlands Earnings Call, and the August 2018 JPM Report—would have put Plaintiff on inquiry notice, thus prompting a diligent investigation that would have uncovered The Beijing News Article or 2018 AIC Decision. (*Id.*)

"'[W]hen the circumstances would suggest . . . the probability that' a violation of the securities laws has occurred—a situation sometimes called 'storm warnings'—we deem the plaintiff on inquiry notice and assume that a reasonable person in his or her shoes would conduct further investigation into the potential violation." *Nomura*, 873 F.3d at 119 (quoting *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 168 (2d Cir. 2005)). While inquiry notice cannot itself trigger the statute of limitations, it can provide a helpful guidepost for determining when a

18

reasonably diligent investor of ordinary intelligence should have discovered the claim. *See Merck*, 559 U.S. at 653. Courts "assume a reasonable plaintiff on inquiry notice would conduct further investigation, but the limitations period begins to run only when, in the course of that investigation, the reasonable plaintiff would have discovered sufficient information to plead a securities-law violation adequately." *Nomura*, 873 F.3d at 119. It is a defendant's "burden to prove that a reasonable investor in the [plaintiff's] shoes would have conducted a fulsome investigation and uncovered information sufficient to make out a plausible claim for relief by [a date more than one year before the claim was asserted]." *Id.* at 122.

Defendants rely on *Gavin/Solmonese LLC v. D'Arnaud-Taylor*, for the proposition that "a reasonably diligent plaintiff would undertake an investigation based on . . . 'news articles and analyst's reports,' and 'prospectuses, quarterly reports, and other information related to their investments.'" 68 F. Supp. 3d 530, 536 (S.D.N.Y. 2014) (quoting *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 276-77 (3d Cir. 2013)), *aff'd*, 639 F. App'x 664 (2d Cir. 2016). True. But even assuming arguendo that the Registration Statement, the English-language transcript of the August 2018 Earnings Call, or the August 2018 JPM Report would have caused a reasonably diligent investor to conduct an investigation (Defs.' Mem. at 15–17), Defendants have failed to demonstrate that such an investigation—whether as a matter of course or as the result of inquiry notice—would have uncovered The Beijing News Article or the 2018 AIC Decision prior to November 15, 2018. *Gavin* certainly does not compel such a finding.

In *Gavin*, the court considered numerous public disclosures made by the company itself and filed with the SEC, including disclosures that revealed a "stark pattern of defaults that would have been obvious by early 2011 through the most cursory examination of public filings." 68 F.

19

Supp. 3d at 536–37.  The court concluded that, "accepting all of [p]laintiff's allegations as true, a substantial portion of [the] information [underlying plaintiffs' claim] was either known or freely available to investors . . . such that the facts necessary to state this claim should have been discovered before [one year prior to the filing of the complaint]." *Id.* at 536.  Moreover, a declaration by one of the investors, from over a year before the complaint was filed, made clear that investors were in fact already aware of the misrepresentations at the time that those misrepresentations had been made to them.  *Id.* at 537.  Similar facts are not present here.  Defendants have not argued that any of Sunlands's public SEC filings contain a substantial portion of the facts necessary to state Plaintiff's claim.  As stated, there is no basis to infer that any investor discovered, or could have discovered through reasonably diligent efforts, The Beijing News Article or the 2018 AIC Decision, prior to November 15, 2018.

Significantly, on that point, it does not appear that even a *reasonably sophisticated analyst* following Sunlands—such as the author of the August 2018 JPM Report—discovered The Beijing News Article or 2018 AIC Decision prior to November 15, 2018.  Although J.P. Morgan issued its report in late August 2018, there is no indication on its face that even the author had uncovered The Beijing News Article or 2018 AIC Decision.  The report merely summarized what was mentioned on the August 2018 Earnings Call without offering any information concerning the content of The Beijing News Article or the 2018 AIC Decision.  (Answer, Ex. D at 1, 3.)   Ultimately, the August 2018 JPM Report, issued nearly four months after The Beijing News Article and approximately one month after the 2018 AIC Decision, assigned Sundlands an "overweight" rating, indicating that the company's stock was expected to perform well.  (*Id.* at 1, 11.)

In contrast, a November 27, 2018 Credit Suisse analyst report on Sunlands discussed the 2018 AIC Decision, stating that Sunlands was "fined by the Beijing government for aggressive sales practices that misled students and aroused negative media publicity." (Am. Compl. ¶ 89.) A subsequent Credit Suisse analyst report, issued on February 15, 2019, stated that despite the changes Sunlands made to its operating process in response to the 2018 AIC Decision, "the company [was] still facing significant slowdown." (*Id.* ¶ 90.) Similar references to, and analysis of, the content of The Beijing News Article or the 2018 AIC Decision are not present in the August 2018 JPM Analyst Report. This suggests to the Court that, at the time the August 2018 JPM Report was published, even J.P. Morgan's analysts had not discovered The Beijing News Article or 2018 AIC Decision despite the August 2018 Earnings Call, which would, under Defendant's theory, prompt a reasonably diligent investigation. Thus, in effect, Defendants ask the Court to find that a reasonably diligent investor of ordinary intelligence should have discovered The Beijing News Article earlier than a professional analyst working for a preeminent financial institution. The Court does not so find.

Finally, as explained above, even if the Court were to find as a matter of law that investors in China-based companies should conduct the level of searching Defendants suggest, Defendants have not met their burden because they failed to demonstrate that it would have resulted in the discovery of The Beijing News Article or the 2018 AIC Decision prior to November 15, 2018. *See DoubleLine Cap. LP v. Odebrecht Fin., Ltd.*, 323 F. Supp. 3d 393, 439–440 (S.D.N.Y. 2018) (denying motion to dismiss on statute of limitations grounds where there were no facts presented to the court to support a finding as a matter of law that a reasonably diligent investor, conducting a reasonably diligent investigation, would have discovered the declaration and attached transcript prior to the relevant date, which was only two months after

21

the transcript was filed); *see also Nomura*, 873 F.3d at 122 (holding that company's failure, at summary judgment, to adduce any evidence of how long it would take a reasonably diligent investor in the plaintiffs' position to investigate the securities claims such that it could adequately plead them was fatal to their statute of limitations defense).  As Plaintiff notes, "the fact that Defendants' cannot point to a single English-language source that specifically discusses the [Beijing News Article or the 2018 AIC Decision] just underscores how obscure it was." (*Id.* at 19.)  The Court agrees.

The Court, therefore, reaches the same conclusion that Judge Block reached on the motion to dismiss.

## CONCLUSION

For the foregoing reasons, Defendants' motion for judgment on the pleadings is DENIED.

SO ORDERED.

Dated: Brooklyn, New York  
         September 21, 2022

/s/ LDH                          
LASHANN DEARCY HALL  
United States District Judge

22